
# JOSHUA RODRIGUEZ

**PLAINTIFF *PRO SE***
**811 FLUSHING AVENUE APT. 16D**
**BROOKLYN, N.Y. 11206**
**TEL: 646-975-8838**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
225 CADMAN STREET
BROOKLYN, N.Y. 11201

Hon. Ramon E. Reyes Jr.
Hon. Lois Bloom

UNITED STATES DISTRICT JUDGES

DOCKET: 23-CV-08313-RER-LB
RODRIGUEZ VS DUNN/ DET. SAVAGE

This letter is in regards of filing a "Motion for Reconsideration" due to having a non-experienced understanding of Lawsuit Proceedings and a Misinterpretation of the Law. As the Plaintiff *Pro Se*, I'm getting a better understanding of the Law and its requirements. Based on a recent decision on Docket: *23-CV-08313*-RER-LB, Defendant Detective Declar Savage was Granted a Dismissal based on "FAILURE TO STATE A CLAIM" Dated: July 07, 2025. I as a Plaintiff would like to ask for an opportunity for Judges respectfully Hon. Ramon E. Reyes Jr. and Hon. Lois Bloom to oversee my part of the case involving my Motion for Reconsideration. I Plaintiff Joshua Rodriguez seek to keep my case strengthen as I have supporting evidence and more clarity, plausible on its face.

Respectfully,

Dated: July. 14, 2025

Joshua Rodriguez
811 Flushing Avenue Apt. 16D
Brooklyn, N.Y. 11206
Email: hypebeast1204@icloud.com
Tel: (646)-975-8838
Plaintiff / *Pro Se*

To:

Inna Shapovalova
*Senior Counsel*
New York City Law Department
100 Church Street
New York, NY 10007
(212)-356-2656
inshapov@law.nyc.gov


Alfred Miller Jr.
Senior Counsel, General Litigation Division
NYC Law Department
100 Church Street
New York, N.Y. 10007
(212)-356-2392
alfmille@law.nyc.gov

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

JOSHUA RODRIGUEZ                         23CV-08313-RER-LB
Plaintiff *Pro Se*


            -Against-


                                         **MOTION FOR
                                         RECONSIDERATION**



LESLIE DUNN Investigator ACS Agency
DECLAR SAVAGE N.Y.P.D. (Special Victims Unit)
Defendants

---

# INTRODUCTION

Based on a recent decision Defendant Detective Declar Savage was Granted Dismissal on July 07, 2025 by "FAILURE TO STATE A CLAIM" on Docket: *23-CV-08313*-RER-LB. I the Plaintiff will like an opportunity for Judges respectfully Hon. Ramon E. Reyes Jr. and Hon. Lois Bloom to oversee my part of the case involving my "Motion for Reconsideration". I Plaintiff Joshua Rodriguez seek to keep my case strengthen as I have supporting evidence and more clarity, plausible on its face.


# OBJECTION TO DEFENDANT MOTIONS

After examining the Motions and Findings of Defendant Detective Declar Savage, the Defendant Exhibits does "Not" in any particular way demonstrates any Probable Cause for Plaintiff's Arrest. I Plaintiff Joshua Rodriguez visualized No Evident Materials, Merits or any Factual Findings to

make a Legal arrest based on Plaintiff Joshua Rodriguez *42 U.S.C. Section 1983* Amended

Complaint Docket # *23-CV-08313-RER-LB* filed at the Eastern District Court 225 Cadman Street

Brooklyn, N.Y. 11201. **(See Exhibit A)**

# SUMMARY OF FACTS

On December 3, 2020 Plaintiff Joshua Rodriguez gave the opportunity for ACS (Administration

of Family and Children Services) 55 W125th Street New York, N.Y. 10027 to start hosting

Supervised visits for the mother of Plaintiff's child Ordered by the Kings Family Court Brooklyn,

N.Y. 11201. ACS Supervised visits was only for child's mother and "Not" the Plaintiff. Plaintiff

child was residing with Plaintiff through a Court Ordered for about 4-5 weeks before December

3, 2020. A home visit from ACS to see and exam Plaintiff's child for injuries occurred 1 week

before December 3, 2020. On this same day for child's first Supervised visits with her mother

during Plaintiff's Drop-Off agreement, Defendant Dunn approached Plaintiff with a close fist

swing to Plaintiff stomach and said "I heard about you" but Plaintiff had no idea what the

Defendant meant when releasing his child to the Defendant. Now during the time for pickup of

Plaintiff child from ACS Agency Plaintiff received a phone call 5 minutes before stating that

ACS performed an "Emergency Removal" with no explanations. I Plaintiff then called 911 and

filed a Police Report dated 12/03/2020 which Officer stated by ACS that ACS will conduct a

Child Safety Conference 12/04/2020.

On December 4, 2020 Defendant Leslie Dunn was supposed to conduct a Child Safety

Conference at 10:00AM, but "FAILED" to performed the Child Safety Conference. Instead

Defendant ACS Investigator Leslie Dunn filed an Article 10 with the Kings Family Court 320

Jay Street Brooklyn, N.Y. 11201. **(See Exhibit B)**.

December 10, 2020 Defendant ACS Investigator Leslie Dunn was given the Ordered by Hon. Emily Ruben at the Kings Family Court 320 Jay Street Brooklyn, N.Y. 11201 during the 1027 Hearing for the Plaintiff to do Services only, as the case remained pending. **(See Exhibit C)**. Plaintiff completed the Services at a rapidly timeframe just to prove his innocence to the Kings Family Courts and to retrieve his child back to his Temporary Custody once again, also Plaintiff obtain a Medical Marijuana License for Drug-Screening Services. **(See Exhibit C1)**.

As for Defendant Detective Declar Savage involvements with Plaintiff Joshua Rodriguez started on December 29, 2020 at approximately 5:30AM with N.Y.P.D. Officers approaching Plaintiff Joshua Rodriguez mother's apartment 811 Flushing Avenue Apt. 16D Brooklyn, N.Y. 11206 with a Search Warrant for Plaintiff Joshua Rodriguez arrest. At the moment no one was at the apartment to get any explanation. Plaintiff Joshua Rodriguez was notified about the N.Y.P.D. actions by neighbors that said N.Y.P.D. indeed had a Search Warrant in their possession when approaching Plaintiff Joshua Rodriguez mother's apartment. I the Plaintiff got in contact with my Private Attorney Lonnie Hart Jr. who practices Criminal Law Cases as he seeked to get involved at exchange of a fee. Attorney Lonnie Hart Jr. was informed by communicating with Defendant Detective Declar Savage that Plaintiff Joshua Rodriguez has a Warrant and Plaintiff has to turn himself in at the SVU (Special Victims Unit) 45 Nevins Street Brooklyn, N.Y. 11217.

The Arrest location took place at SVU (Special Victims Unit) 45 Nevins Street Brooklyn, N.Y. 11217, as I Plaintiff Joshua Rodriguez surrendered voluntarily as I was appointed by my Attorney Lonnie Hart Jr. of the location, date and time to surrender based on a Warrant for Plaintiff Joshua Rodriguez Arrest. Before turning myself in I the Plaintiff Joshua Rodriguez and Attorney Lonnie Hart Jr. asked for any documents or photos pertaining the allegations and Defendant Detective Declar Savage claimed it was not available. **(See Exhibit D)**.

On 1/5/2021 at 4:00PM was the date of the Arrest and Central Booking process of Plaintiff Joshua Rodriguez. While interacting on the first question with Defendant Detective Declar Savage on a question about Plaintiff's residency, Defendant Savage insisted not to believe Plaintiff's answer. So, I Plaintiff Joshua Rodriguez decided to Reserve my Rights on any further questions forward. Defendant Declar Savage seemed angry when having doubt on Plaintiff's answer, when Plaintiff was just telling her the truth. I Plaintiff was then transported by two other Officers from SVU (Special Victims Unit) to Central Bookings for process wherein I was then finger printed there by one of the escorting Officers and taken a mugshot.

On 1/6/2021 I Plaintiff Joshua Rodriguez was released from Kings Criminal Court 120 Schermerhorn Street Brooklyn, N.Y. 11201 on (R.O.R.) Release on Recognizance with multiple pending charges on Docket # *CR-000541-21KN*. **(See Exhibit E)** with an Order of Protection for Plaintiff Joshua Rodriguez to Stay away from his child. **(See Exhibit E1)**.

As for Defendant Declar Savage and the Kings Criminal Court 120 Schermerhorn Street Brooklyn, N.Y. 11201 District Attorney Meredith Abrams gathered together on this case on Plaintiff Joshua Rodriguez, involving 6 counts of Charges which included 1 Felony and 5 Misdemeanors. **(See Exhibit F)**.

I Plaintiff Joshua Rodriguez decided to obtain the Medical Records from Harlem Hospital 506 Lenox Avenue New York, N.Y. 10037 where Plaintiff Child was taken based on the Allegations ACS initiated with the Article 10 Hearing at the Kings Family Court 320 Jay Street Brooklyn, N.Y.11201, that commenced on 12/03/2020. **(See Exhibit G)**.

After reviewing the Medical Records and examining that Plaintiff Joshua Rodriguez child was well-appearing according to the Doctor's examination based on the allegations of the Emergency Removal. Family Court Attorney Kreuza Ganolli who was involved and representing Plaintiff in the Family Court proceedings told Plaintiff Joshua Rodriguez that Plaintiff can file a Lawsuit. **(See Exhibit H).**

I the Plaintiff collected all Case Letters from ACS (Administration for Family and Children Services) which Defendant Investigator Leslie Dunn included Plaintiff's mother so that she wouldn't be a resource to Plaintiff's child during the proceedings. **(See Exhibit I).**

I Plaintiff Joshua Rodriguez kept a journal of all interactions with Defendant ACS Investigator Leslie Dunn. During these visits hosted by Defendant Dunn, Defendant Dunn was making up false accusations and documenting Plaintiff with lies, one which includes interjecting a visit between Plaintiff and Plaintiff's child. Also, Defendant Dunn was resisting visits with the Plaintiff and blaming it on the Plaintiff's child. **(See Exhibit J)** *Plaintiff obtained a USB with these recordings if needed.*

Throughout the process Defendant Leslie Dunn claimed she wanted Plaintiff Joshua Rodriguez to engage with Therapeutic Visits which Plaintiff did "not" agree upon as Plaintiff reviewed the form of the Services and realized the location of the Services was "Not" a legit location, and when reaching out to the number no reply back was given just a voicemail. Plaintiff refused to do Services as he refused to sign any legal documents pertaining those Services. **(See Exhibit K).**

I, Plaintiff Joshua Rodriguez and Kings Family Court Attorney Kreuza Ganolli gathered together all information pertaining the case and formed an Affidavit to support my innocence. **(See**

**Exhibit L).**

Plaintiff Joshua Rodriguez child was residing with the MGM (Maternal Grandmother) temporarily through Foster Care as the case was pending between child's mother and Plaintiff. Defendant ACS Investigator Leslie Dunn removed the child from MGM care as Plaintiff pointed out MGM mental disorders as she was executed from being a Guardian for Plaintiff's child. **(See Exhibit M).**

Plaintiff's Child mother residency changed at the time during the Article 10 Family Case and SVU Criminal Case and Plaintiff wanted the ACS Case transferred because of the distance but Defendant ACS Investigator Leslie Dunn was resisting on passing the Case to the correct borough location of where Plaintiff Child resides. Plaintiff reached out and made 2 Complaints to 311 and Defendant Dunn then releases the case from the Harlem ACS Agency to the Brooklyn ACS Agency. **(See Exhibit N).**

ACS decided to Withdrawn their Article 10 which lead to Plaintiff's "Dismissal" at the Kings Family Court 320 Jay Street Brooklyn, N.Y. 11201 on File: *293639* Docket # *NN-11958-20* CPS# 6970186 **(See Exhibit O)**.

As well as the SVU (Special Victims Unit) Criminal Case at Kings Criminal Court 120 Schermerhorn Street Brooklyn, N.Y. 11201, Plaintiff Joshua Rodriguez was Granted "Dismissal". Dated: 09/10/2021 by the way of "Insufficient Evidence" on Docket # *CR-000541-21KN.* **(See Exhibit P).**

After the case was Dismissed I Plaintiff Joshua Rodriguez placed a claim at the Comptroller's

Office. **(See Exhibit Q)**. I the Plaintiff was given an opportunity for a 50-H Hearing as we discussed the Matter of the Claim and as the SVU (Special Victims Unit) case was mentioned during Plaintiff's questions. **(See Exhibit Q1)**. Plaintiff Joshua Rodriguez was also told to preserve all evidence pertaining to the Allegations. For full transcript of the 50-H Hearing. **(See Exhibit Q2)**.

During the 50-H Hearing I Plaintiff Joshua Rodriguez was given an Errata Sheet to complete any corrections if needed. Corrections was made and changes on the transcript based who was at fault which I Plaintiff Joshua Rodriguez included Defendant Declar Savage also the District Attorney of the Kings Criminal Court 120 Schermerhorn Street Brooklyn, N.Y. 11201. **(See Exhibit R)** * *Details from Errata Sheet Page:58 Line:21*

Based on these Allegations Plaintiff was also listed on the SCR List (Statewide Central Registry) which a Fair Hearing given **(See Exhibit S)** and Plaintiff Joshua Rodriguez name was removed from listing, due to a settlement of "No Evidence" of Child Abuse. **(See Exhibit S1)**.

Plaintiff Joshua Rodriguez contact OCFS (Office of Children and Family Services) and the Plaintiff provided information about the Fraud and Perjury of ACS Case Workers with information pertaining this Claim. And also, how ACS used their Power and Authority to go against innocent individuals. **(See Exhibit T)**.

# <u>OUTRO: NOT TO DISMISS</u><br><u>DEDENDANT DECLAR SAVAGE</u>

During the ability to see the Unsealed and Dismissed Criminal Case documents requested by Defendant Savage former Attorney Thomas Lai, I Plaintiff Joshua Rodriguez noticed

documentation of the Supreme Court which I as the Plaintiff was never "Indicted" as the case never went beyond Criminal Court. **(See Exhibit U).** I Plaintiff also noticed a document which consists Plaintiff child's name, under age minor of 6 years old to be precise to sign Legal Court documents. **(See Exhibit U1).** Additionally, as Plaintiff Joshua Rodriguez child not know the differences between a truth or a lie as Government Officials of the entity ACS (Administration of Children and Family Services) mainly Defendant Investigator Leslie Dunn was involved with controlling and manipulating all matters pertaining Plaintiff child.

Based on the Criminal Court Dismissal at the Kings Criminal Court 120 Schermerhorn Street Brooklyn, N.Y. 11201, I Plaintiff Joshua Rodriguez seeks to obtained Violations of my 4th Amendment (Arrest Defendant Detective Savage), 8th Amendment (Assaulted by Government Official Defendant Dunn) and 14th Amendment (Equal Protection and Due Process) Constitutional Rights. I the Plaintiff still suffer from Trauma, Pain and Suffering, Emotional Distress behind interactions with Defendant Detective Declar Savage and Defendant ACS Investigator Leslie Dunn.

As for Defendant Detective Declar Savage seeking Qualified Immunity, I Plaintiff Joshua Rodriguez request that offer be Denied. Defendant Detective Declar Savage has a history of multiple complaints, and Acting with bad behavior. I the Plaintiff discovered during a Public Search of how Defendant's personalities are based on Defendant Savage Complaints. **(See Exhibit V).** Plaintiff shares Defendant Detective Savage last Complaint reported in 2018 states Defendant Detective Savage Abuse of Authority: Threat to notify ACS. *Details on Page: 2*

I the Plaintiff continue to seek not to Dismiss Defendant Detective Declar Savage badge # 5757 from the case as a thoroughly investigation was not conducted which lead to Plaintiff Joshua

Rodriguez arrest. Malicious Acts and Acting Under the Color of Law without a chance to explore deeper into the evidence is Plaintiff Joshua Rodriguez argument as the case is far too premature to Dismiss Defendant Declar Savage for her Actions, as Plaintiff was Falsely Arrested/ Imprisonment which Defendant Claims for the SVU Case in Criminal Court was Dismissed due to Insufficient Evidence. * *Details on Exhibit P*

*42 U.S.C. Section 1983* is a Federal Law that allows individuals to sue State and Local Government Officials for Violating their Constitutional Rights. False Imprisonment/ False Arrest consists of a 3 years Statue of Limitations which Plaintiff Joshua Rodriguez filed at the Eastern District of New York 225 Cadman Street Brooklyn, N.Y. 11201 before the 3 year timeframe. Plaintiff Mr. Rodriguez *42 U.S.C. Section 1983* Claim substituted the expired Comptroller Claim as Plaintiff Constitutional Rights was violated as there is a 3 years Statute of Limitations time for Plaintiff's False Imprisonment/ False Arrest Claims. I the Plaintiff inserted the *42 U.S.C. Section 1983* Dated on 11/08/2023 and Amended on 12/21/2023, wherein the 3 years expiration date Expires on 01/05/2024.

Plaintiff Joshua Rodriguez will like both Defendants Detective Declar Savage and ACS Investigator Leslie Dunn to remain on this Case and wish to continue to the next phases of Plaintiff's *42 U.S.C. Section 1983* Claim, hosted at the Eastern District Court of New York 225 Cadman Street Brooklyn, N.Y. 11201.

Dated: July 14, 2025

Joshua Rodriguez

Plaintiff *Pro Se*
811 Flushing Avenue Apt. 16D
Brooklyn, N.Y. 11206
(646)-975-8838
Email: hypebeast1204@icloud.com

To:

Inna Shapovalova
*Senior Counsel*
New York City Law Department
100 Church Street
New York, N.Y. 10007
(212)-356-2656
inshapov@law.nyc.gov


Alfred Miller Jr.
*Senior Counsel,* General Litigation Division
NYC Law Department
New York, N.Y. 10007
(212)-356-2392
alfmille@law.nyc.gov

# EXHIBIT A

☆ *Amend / Change. 12/21/2023.*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

Joshua Rodriguez

_____

*(Write the full name of each plaintiff who is filing
this complaint. If the names of all the plaintiffs
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names.)*

-against-

(See Attachment.)

_____

_____

*(Write the full name of each defendant who is
being sued. If the names of all the defendants
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names. Do not include
addresses here.)*

**Complaint for Violation of Civil
Rights**
(Non-Prisoner Complaint)

Case No. 23CV8313

*(to be filled in by the Clerk's Office)*

Jury Trial:   ☐ Yes   ☐ No
*(check one)*



RECEIVED
DEC 2 1 2023
PRO SE OFFICE

---

**NOTICE**

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting
from public access to electronic court files. Under this rule, papers filed with the court should
*not* contain: an individual's full social security number or full birth date; the full name of a
person known to be a minor; or a complete financial account number. A filing may include
*only*: the last four digits of a social security number; the year of an individual's birth; a
minor's initials; and the last four digits of a financial account number.

Plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other
materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an
application to proceed in *forma pauperis*.

*ORIGINAL*

## I.    The Parties to This Complaint

### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Joshua Rodriguez |
| Street Address | 811 Flushing Ave. Apt. 16D |
| City and County | Brooklyn, Kings |
| State and Zip Code | N.Y. 11206 |
| Telephone Number | 646-975-8838 |
| E-mail Address | hypebeast1204@icloud.com |

### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both. Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | City of New York. |
| Job or Title (if known) | |
| Street Address | 100 Church St. |
| City and County | New York, N.Y. |
| State and Zip Code | N.Y. 10007 |
| Telephone Number | |
| E-mail Address (if known) | |

Defendant No. 2

Name                    Declar Savage
Job or Title            Detective  NYPD  Shield # 5757
(if known)
Street Address          45 Nevins St.
City and County         Brooklyn , Kings
State and Zip Code      N.Y.  11217.
Telephone Number        929 - 270 - 9415
E-mail Address
(if known)


Defendant No. 3

Name                    Daniel Cespedes
Job or Title            CPS Worker.
(if known)
Street Address          165 - 15  Archer Ave.
City and County         Jamaica , Queens
State and Zip Code      N.Y.  11433
Telephone Number        718 - 883 - 7362
E-mail Address
(if known)


Defendant No. 4

Name                    Leslie Dunn
Job or Title            CPS Investigator
(if known)
Street Address          55 W 125th St.
City and County         New york , New york
State and Zip Code      N.Y. 10027
Telephone Number        929 - 287 - 1786
E-mail Address
(if known)

3

## II.   Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), you may sue federal officials for the violation of certain constitutional rights.

A.   Are you bringing suit against *(check all that apply)*:

☑ State or local officials (a § 1983 claim)

☐ Federal officials (a *Bivens* claim)

B.   Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

*Amendments : 4, 8, 14 .*

C.   Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

D.   Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.

*Acs brought Perjury and False Evidence to impair my child from my Custody. Det. Savage had me detained for 24 hours.*

4

**III.   Statement of Claim**

State as briefly as possible the facts of your case.  Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events.  You may wish to include further details such as the names of other persons involved in the events giving rise to your claims.  Do not cite any cases or statutes.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

A.   Where did the events giving rise to your claim(s) occur?

Article 10 was brought to Family Court after their decision, ACS went to SVU and Police came knocking at my apartment 12/17/2020 and I surrendered 1/5/2021.

B.   What date and approximate time did the events giving rise to your claim(s) occur?

Art. 10 Case - 12/4/2020
Arrest - 1/5/2021.

C.   What are the facts underlying your claim(s)? *(For example: What happened to you? Who did what? Was anyone else involved? Who else saw what happened?)*

On Dec. 3, 2020 ACS removed/Seized my daughter from my Custody for no reason. Dec. 10, 2020 Family Court believed ACS w/ No Evidence. Jan. 5, 2021 I Surrendered to SVU because a Warrant was issued due to the Allegations. Aug. 13, 2021 ACS withdraw in Family Court. Sept. 10, 2021 SVU Case in Criminal Court got Dismissed 1 Felony / 5 Miss. On Jan. 26, 2023 I Filed for a Fair Hearing for being on the Statewide Central Registry Listing and ACS Settled w/ No Evidence.

IV.  **Injuries**

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

I've missed out on 3 Christmas, 3 Birthday's, 3 Father's Day, and also my daughter 5th grade graduation.

V.  **Relief**

State briefly what you want the court to do for you.   Make no legal arguments. Do not cite any cases or statutes.  If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged.  Explain the basis for these claims.

$ 1,000,000.00   False Accusation / Emotions
$ 500,000.00   False Arrest / Malicious Proce.

Total: $ 1,500,000.00

VI.  **Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

6

**A.**     **For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: __12/21__, 20_23_

Signature of Plaintiff _____

Printed Name of Plaintiff ___Joshua   Rodriguez.___

7

# See Attachments:

1.) The City of New York

2.) NYPD

3.) Administration of Children Services (ACS)

4.) Jewish Child Care Association (JCCA)

# See Attachment Defendant List: 5-7

Defendant No. 5
Name: Kathleen Hobson

Title: CPS Supervisor

Street Address: 55 W 125th Street

City and County: New York, New York

State and Zip Code: N.Y. 10027

Telephone: (347)-389-2370


Defendant No. 6
Name: Shakia Wilkins- Burrell

Title: CPS Worker

Street Address: 55 W 125th Street

City and County: New York, New York

State and Zip Code: N.Y. 10027

Telephone: (646)-946-2130


Defendant No. 7
Name: Myrci Joseph

Title: Foster Care Social Worker

Street Address: 858 E 29th Street

City and County: Brooklyn, Kings

State and Zip Code: N.Y. 11210

Telephone: (917)-789-2912



## Notes: 2018-Present

On Dec. 31,2018 I Joshua Rodriguez filed an ACS Case on BM for placing London in a taxi alone from Queens to Brooklyn at the age of 5 years old. CPS Worker Daniel Cespedes was in charge of the Claim and put the Case "UNFOUNDED". During the time I tried reaching out to CPS Worker Daniel Cespedes and No-Reply, Calls/text & Voicemails. So I told myself something is up because in Family Court with London in my Custody (Temp.) my Attorney told me London is gonna have to go back to her mothers care due to CPS Worker Daniel Cespedes putting my Claim "UNFOUNDED" On the Appeal of the same Claim due to it being "UNFOUNDED" the first time when I filed the Report. I gave him the Police Report as well as an Add-on with a 5 finger slap print on London face that Estephani did months before the taxi incident. So I then go over to the Advocacy Room at 150 William Street and spoke to an Advocate named Ms. Morales, as I explained the situation with CPS Worker Daniel Cespedes and Estephani (BM). Ms. Morales herself said Do these 2 have something going on with each other? I replied yes it seems like it.

In 2020, As time went by I was given a tip from my daughter Grandmother (MGM) and she tells me one day how CPS Worker Daniel Cespedes work phone was Subpoenaed in Queens Family Court. (CPS Worker Marie Renelus-Wray) also confirmed that CPS Daniel Cespedes phone was Subpoenaed but didn't want to speak upon it. MGM said (BM Estephani) claims CPS Daniel Cespedes bribed her but she played a game on him and it was for him to put her serious Claim Unfounded for her, as they were having an Intimate Relationship (Boyfriend & Girlfriend) with each other because of my Claim of Estephani placing London alone in a taxi. The Claim was enough for her to go to Prison behind it and CPS Daniel Cespedes wasn't concerned about London. So I had to wait for Estephani to make another mistake and eventually it happened on August of 2020.

Aug. 20,2020 I noticed my daughter and her little brother Sinclair Landers in Estephani car alone Unattended as I circled the area for parking for my vehicle. I then get to see London a few days later and my daughter tells me Dad, I replied yes darling she replied mommy and Michael was looking for you and they was riding around with a gun (Illegal-firearm) in the car. I immediately made a Claim to ACS and filed a Police Report. ACS then said it wasn't enough to bring to Court I told CPS Worker Shakia Wilkins-Burrell & Supervisor Kathleen Hobson, Are you serious? They both said yes it's not strong enough. I then went over myself to Family Court and Filed an Emergency Petition including I brought to the Courts attention how London hands had a chemical reaction due to acrylic nails and which I was granted Temp. Custody of London on Oct. 23,2020. Claim was "FOUNDED".

*Below is when things got personal with ACS & them deciding to be biased with taking BM side instead of what's best for London. Claim "UNFOUNDED" as I supported my Evidence.

Nov. 13,2020, I filed another Claim with ACS on a Re-File of the incident of 2018 (Taxi Claim) and a recording of London saying how (BM Estephani) crashed her car with London brother in the car. During that Claim CPS Worker Shakia Wilkins-Burrell shows up Unexpectedly, same Worker involved months before in August 2020. I let her in my mothers apartment and CPS Worker Shakia Wilkins-Burrell examined and spoke to London about my call confidentially in London's bedroom. As well as CPS Worker



Shakia Wilkins-Burrell wasn't aware that London was living with me during her 2nd Home Visit. A conversation between my mother Ivette Rodriguez and CPS Worker Shakia Wilkins-Burrell came up about how London has been exposed to Hennessy under Estephani care. CPS Worker Shakia Wilkins-Burrell then questioned London about the Hennessy/ Alcohol Beverage. She asked London 5 questions about Hennessy and London answered it. But the questions were asked in front of (PGM) Ivette, Lori (my sister), and myself Joshua NOT Confidential in the room. During those questions I felt like she interrogated London as if she was a Criminal. Behind that we had got into some words (No profanity or Violence) just loud words over words and it got to a point I told CPS Worker Shakia Wilkins-Burrell to lower her tone of voice because she was yelling at me in front of London. I then said I called in for a Re-File of a Claim from 2018, I said Let's talk about that. CPS Worker Shakia Wilkins-Burrell then says you can forget about that, I then said that doesn't just get thrown under the rug I also said I was given a tip how the person who was in charge CPS Worker Daniel Cespedes phone was Subpoenaed and I know. I said you guys are no help I'm done talking, the door is right there when you finish.

I then was asked by ACS Supervisor Kathleen Hobson to bring London to a Visit to see Estephani & MGM at the ACS Agency in Manhattan 55 W125th Street, as Safe-Horizon was supposed to conduct the visits but due to the Pandemic they was prolonging time.

Referee Denise Valmè Lundy in Kings Family Court gave me the okay for ACS to conduct the visit. First Visit Dec. 3,2020 ACS did an Emergency Removal for no reason Claiming Negligence/ Child Abuse. During Drop-Off Investigator Leslie Dunn recovered my child and as I waited for the elevator to leave the building Investigator Leslie Dunn threw a gut punch to my stomach (Assault) and she says I heard about you, I was Clueless. As I waited for the time to pick up London I get a phone call 5 mins before pick-up time and Supervisor Kathleen Hobson states that they doing an Emergency Removal with no explanations. I called 911 and Filed a Police Report because they was expecting reaction, which my reaction was to call the Police.

Dec. 4,2020 ACS Supervisor Kathleen Hobson and Investigator Leslie Dunn was supposed to conduct a Child-Safety Conference at 10AM But it never happened. I went over to the 90th Precinct 2 hours later and on the Precinct Front Desk Record Book Officer noted that ACS never called for the Child-Safety Conference. Same day Investigator Leslie Dunn files a Neglect Case on me and left London with MGM in Foster Care.

Dec. 5,2020 On a Saturday which I found weird, I got a phone call Anonymously asking if my name was Michael Landers I replied No. I then said who's this? They replied ACS I then replied No my name is Joshua Rodriguez. After I said that, we ended the conversation in which they didn't provide no more information on the reason of the phone call.



Dec. 10,2020 Kings Family Court believed ACS with No evidence (Hospital Records/Photos) and due to ACS being favorable the Judge chose their side and I was told I had to do Visits and Services until next Court Date. Approximately 2 weeks later Detectives came knocking on my mother's apartment door looking for me. I then called my Attorney Lonnie Hart from (Criminal Court) and I had him called the Precinct to see what I was Wanted for. Lonnie then tells me I have to turn myself into SVU (Special Victims Unit). Lonnie spoke to Det. Savage before the arrest and asked her if ACS has any photos or any Documents and ACS Investigator Leslie Dunn admitted to Det. Savage that she "Lost" the photos. I hired him and then surrendered to SVU days later Jan. 5,2021. After being detained for 24 hours released on R.O.R. with an Order of Protection, I told myself I didn't hit London let me get the Medical Records from the Hospital which I should of been gotten I told myself and I also said start recording these people they keep making stuff up that isn't true. The Medical Records states by the Doctor that London was Well-Appearing on the date of the Emergency Removal 12/3/2020. During the time Investigator Leslie Dunn asked me to write a letter stating I hit my child I told her if she was out of her mind during the 1st Visit as signing the Hippa Form to see London. Approximately a week After Investigator Leslie Dunn Interjected a visit which I have recorded. Following week (Phone Call Recording) Investigator Leslie Dunn claimed London pooped on herself on her way to a visit due to her being nervous as I got documented behind those Allegations that never happened. I have both recordings of Investigator Leslie Dunn claiming she spoke to London about her having an (Accident on herself) and the other recording me asking London if that ever happened and London was Clueless saying no that, that never happened. London was also engaged with Mental Health Services with Interborough Developmental Center behind these allegations which is wrong from ACS. Throughout the time I've asked Investigator Leslie Dunn to conduct the visits after 3pm due to the visits interfering with London's Education as the visits were from 10am-12pm, at that moment the Children were doing schooling Virtually (8am-2pm) as London was missing out 2 days of the week. I've Requested for the visits to be arranged to after 3pm due to the distance from Brooklyn to Manhattan, Investigator Leslie Dunn Denied my request. Also I've Requested a Report Card from London's School and my daughter grades were horrible and Investigator Leslie Dunn claims that London was doing very well in which I knew she wasn't. Based on some questions I gave to my Attorney while the disputing the Article 10 Case we caught Investigator Leslie Dunn lying in her Testimony's 2X twice, one time Honorable Glover said Ms. Dunn I wanna see you next Court Date but Dunn didn't show up as she sent over Supervisor Kathleen Hobson on that following Court Date. Throughout everything my daughter was residing with the MGM from the date of the Emergency Removal. As the Case went over to JCCA (Foster Care) MGM was then removed of having Guardianship as she suffers from Mental Health Disorders as I told Social Worker Myrci Joseph and the Case went back to ACS. So my daughter was given back to her mother as she herself has Mental Health problems as I have on Records but ACS said to the Courts that the mother is a fit parent but ACS Records show different. Somehow with ACS help BM Estephani got a (NYCHA) Housing transfer from Manhattan to Brooklyn. I then asked for a New Social Worker for my child since London doesn't reside in Manhattan anymore but Investigator Leslie Dunn wanted the Case to go back to Manhattan as she was resisting to pass the Case off to the Brooklyn ACS Agency. I had to call 311 twice and made 2 Complaints in order to get the Case transferred to Brooklyn ACS Agency. As going Back and forth in Family Court I was then asked if I wanted to plea to an ACD (twice) 2 Court Dates after each other. I replied I can't take that because I never hit London. If I hit London I'd take any ACD I told my Attorney but I didn't hit London. On



Aug. 13,2021 ACS Withdraw their Neglect Hearing in Kings Family Court as for the Evidence I gathered and ACS also Withdraw in Criminal Court (SVU Case) with Insufficient Evidence on Sept. 10,2021 After the Cases was over I've looked over the file of the Criminal Case (SVU Case) and noticed how there's a mix of Criminal Court papers and Supreme Court papers while the Case never went to Supreme Court and I was never Indicted.

Throughout the time I've went towards 150 William Street again (2nd Time) and spoke to madam name Susan Sala as she took in my secondary Report.

Also as a note I went down to 180 Maiden Lane New York, N.Y. (NYC DOI of ACS) and got interviewed there from a woman name Alex & Kristen as I supplied them with my Evidence on the ACS workers that was involved on my case.

After the case was over I Requested State Records from OCFS Albany, N.Y. and the first time they sent me Michael Landers (BM other BF) Records. Then on my 2nd Request OCFS sent me Estephan which is BM name without the letter "i" in the ending, I suspect that's an alias name for me, this all starts from ACS Worker Daniel Cespedes. So after reviewing the Records I tone to notice where the Records are being tampered from the patterns of how it originally goes.

In the Ending of 2021 sometime in the last 3 months of that year I filed a Notice of Claim and had a 50-H Hearing which was completed successfully. I was sent over the Transcript from the 50-H with an Errata sheet to make corrections and I've submitted it back but was never given back any other information as I was told in the Hearing to preserve all my Evidence from the person who interviewed me at the 50-H.

As for May. 12,2022 I discovered a TikTok Video of London with (2X) 12 inch Kitchen Knives, the video was given to me by my sister. I brought it to Kings Family Court attention because ACS won't do nothing about it if I told them. After reviewing the Family Court paperwork I found something awkward as Referee Valmè Lundy placed me under the Respondent and BM Estephani as the Petitioner on the Tik-Tok Allegations that I discovered as it happened under the mothers care not mines.

As for Jan. 26,2023 I wanted to clear my name from the Statewide Central Registry's because I wasn't aware of my name being on it, and due to ACS withdraw I thought my name was cleared and I thought I was gonna retrieve my child back. I provided my Evidence for the SCR Hearing as ACS didn't show up and my name was removed from the SCR List due to ACS settling with No Evidence.

I've missed out on 3 Christmas, 3 Birthday's, 3 Father's Day, & London's 5th Grade Graduation as well.

Also note that NYPD also made a previous arrest 3-4 months on Domestic Violence/ Harassment before the SVU Case, wherein I surrendered & I was released through the backdoor of the Manhattan Courthouse as that case was Declined (Declined Prosecution).



# EXHIBIT B

Secs. 1012, 1031 F.C.A.                           (Child Protective)

FAMILY COURT OF THE STATE OF NEW YORK
CITY OF NEW YORK, COUNTY OF KINGS

Attorney: JOHNSON, C
Judge:
----------------------------------x
            In the Matter of        :    Docket No: NN-11958-20
                                    :
L███████ R█████████                 :
                                    :    PETITION NEGLECT CASE
                                    :
A Child Under Eighteen Years        :
of Age Alleged to be Neglected by   :
                                    :
JOSHUA RODRIGUEZ                     :
                                    :
                                    :    Child Protective Specialist:
                                    :    LESLIE DUNN
                                    :    ACS #: 6970186
                                    :    Unit #: 437-4
                                    :    Telephone: 646-695-6154
                                    :
                                    :
_____   :
            Respondent (s)           :
----------------------------------x

**NOTICE: IF YOUR CHILD REMAINS IN FOSTER CARE FOR FIFTEEN (15) OF THE MOST RECENT TWENTY-TWO (22) MONTHS THE AGENCY MAY BE REQUIRED BY LAW TO FILE A PETITION TO TERMINATE YOUR PARENTAL RIGHTS AND MAY FILE BEFORE THE END OF THE 15-MONTH PERIOD.**

TO THE FAMILY COURT:

The undersigned petitioner respectfully shows that:

1.  Petitioner David A. Hansell, Commissioner of Administration for
    Children's Services, a Child Protective Agency with offices at 150
    William Street, New York, New York, is authorized to file a petition
    under Article 10 of the Family Court Act.

2.  L██████ R█████████  is a female child under the age of eighteen years,
    having been born on ███████████.

3. Said child resides at ███████████████ APT. ███, ████████, ██,
   ██████.

4. The father of said child is
   or is alleged to be JOSHUA RODRIGUEZ who resides at 811 FLUSHING
   AVE APT 16D, BROOKLYN, NY, 11206.
   The father's date of birth is ████████.
   The mother of said child is ESTEPHANI RODRIGUEZ who resides at ██
   ████████████████████████████████████████████████████
   The mother's date of birth is ████████.

5. Prior to the filing of this petition, pursuant to Family Court Act
   Section (1024) said child was removed from the custody of the
   parent(s) or other person(s) legally responsible for the care of said
   child without court order on the 3rd day of December, 2020, at
   6:00pm.

6. There was not sufficient time to obtain a court order pursuant to
   Family Court Act Section 1022, because
   See Addendum II.

7. The removal of the child was necessary because

   See Addendum III.

8. (Upon information and belief), said child is a neglected child in
   that: (Specify grounds of neglect under Section 1012 of the Family
   Court Act.)
   See Addendum I.

9. (Upon information and belief),
   JOSHUA RODRIGUEZ , the Legal Father of said child
   is the person who is responsible for neglect of said child.

10. There currently is not reason to believe, or information that
    suggests or indicates that the child is a Native American child.

    Petitioner is required to obtain education information and to provide
that information to foster care providers and other parties to this
proceeding. Unless otherwise obtained by release, Petitioner thus seeks a
court order to obtain the education records (including special education
records) of each child named in this petition who is not placed with a
parent(s)/legal guardian(s), and a court order to provide such records to
service providers where such records are necessary to enable the service
provider to establish and implement a plan of service.

## VERIFICATION

STATE OF NEW YORK     )
COUNTY OF KINGS       SS.:


LESLIE DUNN, being duly sworn, deposes and says that (s)he is employed by Administration for Children's Services, a Child Protective Agency; and is acquainted with the facts and circumstances of the above-entitled proceeding; that (s)he has read the foregoing petition and knows the contents thereof; that the same is true to (his) (her) own knowledge except as to those matters therein stated to be alleged upon information and belief, and that as to those matters (s)he believes it to be true.

**Leslie Dunn** Digitally signed by Leslie
Dunn
Date: 2020.12.04
14:59:48 -05'00'

_____
Petitioner
David A. Hansell, Commissioner
Administration for Children's
Services
By: LESLIE DUNN
Child Protective Specialist

Sworn to before me, this
4th day of December 2020


_____
Notary Public

**ADDENDUM I**

CASE NAME      ESTEPHANIE RODRIGUEZ
CHILD NAME     LONDON RODRIGUEZ
CASE NUMBER    6970186
DATE PET FILED  12/04/2020

| THE CHILD | THE RESPONDENT |
|-----------|----------------|
| LONDON RODRIGUEZ (DOB 12/27/2012) | JOSHUA RODRIGUEZ |

L██████ R████████ (D.O.B. ███████████) is a child under eighteen years of age whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of her father, JOSHUA RODRIGUEZ (D.O.B. ███████████, to exercise a minimum degree of care, in that:

1. The respondent father, Joshua Rodriguez, fails to provide the child with proper supervision or guardianship in that:

a. According to Kings County Family Court records, the family is known to the Court under an existing docket, V-08709-16/20B, currently pending before Hon. Denise Valme-Lundy. According to Kings County Family Court records, the respondent filed an Order to Show Cause under that docket on October 5, 2020. According to Kings County Family Court records, that filing alleged that on or about August 24, 2020, the subject child ██████ sustained a chemical injury to her hand, ███████ said that she had seen her mothers paramour with a gun, and the mother had been driving with ███████ in the front seat without a license, registration, or insurance. According to Kings County Family Court records, the respondent father was subsequently awarded temporary physical custody of ███████ on or about October 15, 2020, and on or about November 24, 2020, the Court ordered that the mothers visitation with ███████ be supervised.

b. According to ACS case records, on or about November 13, 2020, ACS Child Protective Specialist Shakia Wilkins-Burrell interviewed the subject child in the presence of the respondent and the paternal grandmother. According to ACS case records, the respondent told the subject child to tell CPS Wilkins-Burrell that her mother gave her alcoholic drinks. According to ACS case notes, when CPS Wilkins-Burrell asked the respondent not to tell the child what to say, the respondent became upset and aggressive, began to shout at her, and charged at her in what CPS Wilkins-Burrell believed to be an attempt at assaulting her. According to ACS case notes, the paternal grandmother physically intervened and held the respondent back from reaching CPS Wilkins-Burrell. According to ACS case notes, the subject child was present in the room and observed the entire incident.

c. On or about December 3, 2020, L██████ came to the ACS field office for a supervised visit with her mother and was interviewed by the undersigned in the presence of the maternal grandmother. Initially, L██████ stated that she has never been the subject of any physical discipline. The maternal grandmother told L██████ that she could be honest with the undersigned, at which point L██████ began crying uncontrollably. L██████ reported that the respondent tells her to lie about what happens in the respondents home, that she is afraid of the respondent, and that he has hit her with the buckle on his belt on multiple occasions, most recently in November, a few days prior

to December 3. London reported that these occasions left her with black and blue marks. London's crying then became hysterical and she further disclosed that people will regularly come to the respondent's home and give him money, and he will give them "green candy canes" in small plastic bags. London also reported that she sees the respondent smoking "candy canes" in the home. London was showed a picture of an actual candy cane and did not recognize what it was. According to London, the respondent tells her what she has to say to ACS workers and he has previously told her to lie to the prior worker on the case. London further reported that she had a phone call with her mother recently while the respondent claimed they were in New Jersey. According to London, they were actually at the case address and the respondent told her to say her phone screen was broken and to cover the cameras with black tape so that the mother would not learn that they were still at home.

2. The respondent father, Joshua Rodriguez, fails to provide the child London with proper supervision or guardianship by unreasonably inflicting or allowing to be inflicted harm, or a substantial risk thereof, including the infliction of excessive corporal punishment on the child in that:

a. Allegations 1a-1c are hereby realleged as if stated here in full.

WHEREFORE, as a result of the foregoing, the subject child is neglected pursuant to Article 10 of the Family Court Act of the State of New York.

**PURSUANT TO FAMILY COURT ACT SECTION 1031 (e) Petitioner states:**

1.     l███████ R███████ was removed prior to filing this petition on
       3rd day of December, 2020 at 6:00pm.

2. The circumstances necessitating the removal of the child prior to filing a
   neglect or abuse petition are as follows:


   [  ] See allegation(s) in the petition;


   [  ] Petitioner assessed the child to be in such circumstances that the
   child's continuing in said place or residence or in the care and custody
   of the parent or other person legally responsible presented an imminent
   danger to the child's life and/or health if not immediately removed;


   [  ] Continuation in the home would be contrary to the child's best
   interests and under the circumstances, efforts to prevent or eliminate the
   need for removal were determined to be inappropriate;


   [  ] Other, explain:

3. This child was removed pursuant to:


   [   ] FCA 1021 (parental consent to temporary removal attached);

   [   ] FCA 1022 (court authorized removal);

   [   ] FCA 1024 (emergency removal without prior court authorization);

**REASONABLE EFFORTS TO PREVENT OR ELIMINATE THE NEED FOR REMOVAL OF CHILD FROM HOME**

1. The child L█████ R████████ was or should be removed pursuant to the provisions of the Family Court Act and applicable law.

2. The continuation of residence by the child in the child's home is or would be contrary to the welfare and best interests of the child and the temporary removal of said child from the child's place of residence is necessary to avoid imminent risk to the child's life or health.  Continued placement of the child in the child's home would be contrary to the welfare and best interests of the child because:

3. [ x ] Reasonable efforts to prevent or eliminate the need for the above-described removal, were provided prior to the date of the hearing as follows:

4. Imminent risk to the child would not be eliminated by the issuance of a temporary order of protection.

# EXHIBIT C

**PRESENT:**   Hon. Emily Ruben

In the Matter of

L████ R████ (DOB: ██████████),

A Child under Eighteen Years of Age
Alleged to be Neglected by

**Joshua Rodriguez,**

Respondent.

File #:       293639
Docket #:   NN-11958-20

CPS #:      6970186

**TEMPORARY REMOVAL
ORDER AFTER 1027
HEARING**

PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE ATTORNEY FOR THE CHILD UPON THE APPELLANT, WHICHEVER IS EARLIEST.

IT IS ORDERED that based on the record and for the reasons stated on the record;

IT IS ORDERED that the Court finds that continuation by the child, L████ R████ in the home of RESPONDENT FATHER, JOSHUA RODRIGUEZ would be contrary to the welfare and best interests of the child and temporary removal of the Subject Child from the child's father is necessary to avoid imminent risk to the child's life and health in light of circumstances that, the father has coached the child and used excessive corporal punishment on the child causing her great distress and fear; and it is further

ORDERED that the Court finds that imminent risk to the child would not be eliminated by the issuance of an order of protection; and it is further;

ORDERED that the Court finds that reasonable efforts were made as the family had a long history of ACS involvement; and it is further

ORDERED that (ANY Hospital) (ANY M.D.) is hereby authorized to provide such emergency medical or surgical procedures for the said child as may be necessary to safeguard the child's life or health; and it is further

ORDERED that Remand is granted and the child, L████ R████ is temporarily placed in the custody of ACS with a restrictive placement tot he maternal grandmother. She is not to be removed from the maternal grandmother absent court order or a child protective emergency; and it is further

ORDERED that the matter is set for a permanency hearing for a date certain on June 21, 2021, subject to this date being reset by the assigned Judge; and it is further

ORDERED that each parent shall have at least two (2) agency supervised visits per week with L████ and the agency has discretion to allow for resource supervised visits for each parent; and it is further

ORDERED that neither parent and no adult relatives shall speak badly of the other parent or parent's family members in the presence of L████; and it is further

ORDERED that ACS is directed to provide all counsel with a service plan for Mr. Rodriguez no later than close of business tomorrow, 12/11/20.

**Dated:** December 10, 2020                **ENTER**

**Hon. Emily Ruben**

Check applicable box:
☐ Order mailed on [specify date(s) and to whom mailed]:_____
☐ Order received in court on [specify date(s) and to whom given]:_____

# EXHIBIT C1

# CERTIFICATE OF ACHIEVEMENT

HEREBY WE CERTIFY THAT

## JOSHUA  RODRIGUEZ

Has successfully completed a parenting evidence based program in

### PARENTING GUIDANCE SKILLS FOR ALL AGES PROGRAM

Presented by: The Parenting training network workshops program.



12/18/2020

Date

Signature



# CERTIFICATE OF ACHIEVEMENT

HEREBY WE CERTIFY THAT

## JOSHUA RODRIGUEZ

Has successfully completed a parenting evidence based program in

### ANGER MANAGEMENT PROGRAM

Presented by: The Parenting training network workshops program.

12/18/2020

Date



Signature

 NEW YORK STATE | Department of Health | **Medical Marijuana Program** REGISTRY IDENTIFICATION CARD



RODRIGUEZ
JOSHUA
DOB: 12/04/1986
811 FLUSHING AVE APT
BROOKLYN, NY 11206

ISSUE DATE: 12/10/2020

PATIENT

1-1064330117

For questions regarding the New York State
Department of Health Medical Marijuana Program contact:
**1-844-863-9312 or mmp@health.ny.gov**

If found, please return in an envelope to:
New York State Department of Health
PO Box 2071
Albany NY, 12220

**Medical marijuana must be kept in the original package, as
dispened by the registered organization. Public Health Law
prohibits smoking medical marijuana.**

NEW YORK STATE | Department of Health

# EXHIBIT D




Lonnie Hart >



> Did you find out what it was about or she didn't describe it yet?

It's what you thought. Some bullshit about a faded bruise reported by the ACS worker. I asked if they had any photos and the detective admitted the ACS worker "lost" the photos so they don't have much.

# EXHIBIT E

# New York City Police Department
## Omniform System - Arrests

| | |
|---|---|
| **RECORD STATUS: ARR PRC CMPL** | **Arrest ID: K21600609 - Q** |

**Arrest Location: INSIDE OF 811 FLUSHING AVENUE APT: 16D** | **Pct: 090**

| | | |
|---|---|---|
| **Arrest Date:** 01-05-2021 | Processing Type: ON LINE | **Current Location** of Perpetrator: |
| **Time:** 16:10:00 | DCJS Fax Number: KO000473 | Borough: Brooklyn |
| Sector: C | Special Event Code: NO - NOT APPLICABLE | Type: ALL PD LOCATIONS |
| Strip Search Conducted: NO | DAT Number: | Location: CHILD ABUSE SQUAD BROOKLYN |
| Viper Initiated Arrest: NO | ICAD# | |
| Stop And Frisk: NO | Return Date: 0000-00-00 | |
| Serial #: 0000-000-00000 | | |

**DAT Declined Reason(s):**

Family Offense

| **COMPLAINTS:** | Arrest #: K21600609 |
|---|---|

| COMPLAINT NUMBER | REPORT DATE | RECORD STATUS | OCCUR DATE | OCCUR TIME |
|---|---|---|---|---|
| 2020-090-07113 | 2020-12-14 | Valid, Initial Arrests made | 2020-11-01 | 00:01 |

| **CHARGES:** | Arrest #: K21600609 |
|---|---|

| CHARGE | ATTEMPT? | LAW CODE | CLASS | TYPE | COUNTS | DESCRIPTION |
|---|---|---|---|---|---|---|
| TOP | No | PL 120.05 02 | F | D | 3 | ASLT 2: SERIOUS INJ W/ WEAPON |
| #02 | No | PL 120.05 08 | F | D | 3 | ASLT CAUS INJ PERSON < 11 YRS |
| #03 | No | PL 260.10 01 | M | A | 3 | ACT IN MANNER INJUR CHILD < 17 |
| #04 | No | PL 120.00 01 | M | A | 3 | ASLT W/INT CAUSES PHYS INJURY |
| #05 | Yes | PL 265.01 02 | M | A | 3 | CRIM POSS WEAP-4TH:INT TO USE |
| #06 | No | PL 240.26 01 | V | 0 | 3 | HARASSMENT-2ND:PHY CONTACT |

| How Arrest came about: | | # Injuries: 00 | # Fatalities: 00 | Test Given: | | Reason Vehicle Not Forfeit: | |
|---|---|---|---|---|---|---|---|
| Blood Specimen Taken: | Blood Specimen Refused: | Urine Specimen Taken: | Urine Specimen Refused: | Oral Fluid Specimen Taken: | Oral Fluid Specimen Refused: | Breath Sample Refused: | Breath Sample Reading: | BrAC: 0.0 |
| Role: IDTU Technician | Department: NYPD | Tax: 0 | Command: | Shield: 0 | Rank: | Last Name: | First Name: MI: | IDTU/Blood Case No: |
| Role: Point Person | Department: | Tax: | Command: | Shield: | Rank: | Last Name: | First Name: MI: |
| Role: Supv in Charge of Checkpoint | Department: | Tax: | Command: | Shield: | Rank: | Last Name: | First Name: MI: |

| **DETAILS:** | Arrest #: K21600609 |
|---|---|

Was the defendant recording police-related activity at time of arrest?
NO

PURSUANT TO A CONFIDENTIAL INVESTIGATION RECEIVED FROM THE KINGS COUNTY DISTRICT ATTORNEY'S OFFICE, REGARDING AN ALLEGATION OF CHILD ABUSE. THIS CASE IS BEING INVESTIGATED BY DET. SAVAGE, BKCAS. CASE #1455.
-SUBSEQUENTLY THE CV WAS FORENSICALLY INTERVIEWED AT THE BROOKLYN CHILD ADVOCACY CENTER AND DISCLOSED

BEING STRUCK WITH THE METAL PART OF A BELT ON HER THIGH AREA OF HER LEGS ON (2)SEPARATE OCCASSIONS AT HER FATHER'S HOME BY HER FATHER. ONE TIME AT HER PGM HOME BY HER FATHER, DURING THE MONTH OF NOVEMBER. CV STATES, SHE HAD BRUISES AND CAUSED HER PAIN. CV IS 7 YEARS OLD AND SUBJECT IS 33.

| DEFENDANT: RODRIGUEZ, JOSHUA | NYSID #: | Arrest #: K21600609 |
|---|---|---|

Gang/Crew Affiliation: NO
Name:
Identifiers:

| LOCATION | ADDRESS | CITY | STATE/CNTRY | ZIP | APT/ROOM | PCT |
|---|---|---|---|---|---|---|
| HOME-PERMANENT | | | | | | |

Phone # and E-Mail Address:
HOME: REFUSED
CELL:
BUSINESS:REFUSED
E-MAIL: REFUSED

N.Y.C.H.A. Resident: **YES**    N.Y.C. Housing Employee: On Duty:
Development: **BUSHWICK**    N.Y.C. Transit Employee:

Physical Force:**NONE**

Gun:
Weapon Used/Possessed: **NONE**    Make:    Recovered:
Non-Firearm Weapon:    Color:    Serial Number Defaced:
Other Weapon Description:    Caliber:    Serial Number:
Type:
Discharged: **NO**

Used Transit System: **NO**
Station Entered:
Time Entered:
Metro Card Type:
Metro Card Used/Poses:
Card #:

| CRIME DATA | DETAILS |
|---|---|
| MODUS OPERANDI | UNKNOWN |
| ACTIONS TOWARD VICTIM | INJURY USING PHYSICAL FORCE |
| CLOTHING | OUTERWEAR - SNORKEL, SKI, HOODED JACKET - BLACK |
| CLOTHING | ACCESSORIES - SWEAT / JOGGING CLOTHES - GRAY |
| CLOTHING | FOOTWEAR - SNEAKERS - MULTI COLORED OR STR |
| CLOTHING | HEADGEAR - OTHER - GREEN |
| CHARACTERISTICS | GOATEE |
| BODY MARKS | ARM -TATTOO WITH WORDS ONLY - DESCRIBE:LONDON |
| IMPERSONATION | UNKNOWN |

| JUVENILE DATA: | Arrest #: K21600609 |
|---|---|

Relative Notified:  Personal Recog:
Number Of Priors: 0        Name:
School Attending:        Phone Called:
Mother's Maiden Name:        Time Notified:

| ASSOCIATED ARRESTS: | Arrest #: K21600609 |
|---|---|

ARREST ID COMPLAINT #

**No Vehicles for Arrest #**

| DEFENDANTS CALLS: | Arrest #: K21600609 |
|---|---|

CALL.# NUMBER DIALED  NAME - PROVIDED BY DEFENDANT  NAME AS LISTED IN CELL PHONE  RELATIONSHIP  CALL COMPLETED
1        - -            REFUSED,REFUSED            REFUSED                    NO

| INVOICES: | Arrest #: K21600609 |
|---|---|

INVOICE# COMMAND PROPERTY TYPE VALUE

| ARREST RULES: | Arrest #: K21600609 |
|---|---|

ORIGINAL ARREST PROCESSING TYP : O
OFFENCE DATE : 11/01/2020
AGE AT TIME OF OCCURRENCE : 33
AGE BAND : C_RTA_2019
JUV. OFFENDER CHARGE : , IS JUV .OFFENDER : FALSE
JUV. DELINQUENT CHARGE : , IS JUV.DELINQUENT : FALSE
JUV. ADOLESCENT CHARGE : , IS ADOLESCENT : FALSE

| ARRESTING OFFICER: DT3 DELCAR S SAVAGE | Arrest #: K21600609 |
|---|---|

Tax Number: 943021         On Duty: NO
Other ID (non-NYPD): 0        In Uniform: NO
Shield: 5757         Squad: D
Department: NYPD         Chart: 99
Command: 674    Primary Assignment: INVESTIGATIVE

Force Used: NO - No Force Used by any MOS
Type:
Reason:
Officer Injured: NO
Officer Body Worn Camera: NO
TRI Number: 0000-000-00000 Suffix: 0

| Arresting Officer Name: DT3 SAVAGE, DELCAR S | Tax #: 943021 | Command: 674 | Agency: NYPD |
|---|---|---|---|
| Supervisor Approving: SGT BILL BENJAMIN D | Tax #: 941008 | Command: 674 | Agency: NYPD |
| Report Entered by: DT3 SAVAGE, DELCAR | Tax #: 943021 | Command: 674 | Agency: NYPD |

END OF ARREST REPORT
K21600609

Print this Report

CRIMINAL COURT OF THE CITY OF NEW YORK
PART APAR COUNTY OF KINGS

STATE OF NEW YORK
COUNTY OF KINGS

THE PEOPLE OF THE STATE OF NEW YORK

v

JOSHUA RODRIGUEZ

DETECTIVE DELCAR SAVAGE SHIELD NO.3757, OF 67% COMMAND SAYS THAT ON OR ABOUT AND BETWEEN NOVEMBER 01,2020 12:01 AM AND NOVEMBER 30,2020 11:59 PM AT 811 FLUSHING AVENUE COUNTY OF KINGS, STATE OF NEW YORK,

THE DEFENDANT COMMITTED THE OFFENSE(S) OF:

| PL 120.05(2) | ASSAULT IN THE SECOND DEGREE (DCO) |
| PL 120.14(1) | MENACING IN THE SECOND DEGREE (DCO) |
| PL 260.10(1) | ENDANGERING THE WELFARE OF A CHILD (DCO) |
| PL 265.01(2) | CRIMINAL POSSESSION OF A WEAPON IN THE FOURTH DEGREE |
| PL 120.15 | MENACING IN THE THIRD DEGREE (DCO) |
| PL 240.26(1) | HARASSMENT IN THE SECOND DEGREE |

IN THAT THE DEFENDANT DID:

WITH INTENT TO CAUSE PHYSICAL INJURY TO ANOTHER PERSON, CAUSE SUCH INJURY TO SUCH PERSON OR TO A THIRD PERSON BY MEANS OF A DEADLY WEAPON OR A DANGEROUS INSTRUMENT; INTENTIONALLY PLACE OR ATTEMPT TO PLACE ANOTHER PERSON IN REASONABLE FEAR OF PHYSICAL INJURY, SERIOUS PHYSICAL INJURY OR DEATH BY DISPLAYING A DEADLY WEAPON, DANGEROUS INSTRUMENT OR WHAT APPEARED TO BE A PISTOL, REVOLVER, RIFLE, SHOTGUN, MACHINE GUN OR OTHER FIREARM; BY PHYSICAL MENACE, INTENTIONALLY PLACE OR ATTEMPT TO PLACE ANOTHER PERSON IN FEAR OF DEATH, IMMINENT SERIOUS PHYSICAL INJURY OR PHYSICAL INJURY; WITH INTENT TO HARASS, ANNOY OR ALARM ANOTHER PERSON, STRIKE, SHOVE, KICK OR OTHERWISE SUBJECT SUCH OTHER PERSON TO PHYSICAL CONTACT, OR ATTEMPT OR THREATEN TO DO THE SAME; KNOWINGLY ACT IN A MANNER LIKELY TO BE INJURIOUS TO THE PHYSICAL, MENTAL OR MORAL WELFARE OF A CHILD LESS THAN SEVENTEEN YEARS OLD OR DIRECT OR AUTHORIZE SUCH CHILD TO ENGAGE IN AN OCCUPATION INVOLVING A SUBSTANTIAL RISK OF DANGER TO HIS OR HER LIFE OR HEALTH; POSSESS ANY DAGGER, DANGEROUS KNIFE, DIRK, MACHETE, RAZOR, STILETTO, IMITATION PISTOL, OR ANY OTHER DANGEROUS OR DEADLY INSTRUMENT OR WEAPON WITH INTENT TO USE THE SAME UNLAWFULLY AGAINST ANOTHER.

THE SOURCE OF DEPONENT'S INFORMATION AND THE GROUNDS FOR DEPONENT'S BELIEF ARE AS FOLLOWS:

DEPONENT IS INFORMED BY LONDON RODRIGUEZ THAT, ON OR ABOUT THE ABOVE TIMES AND PLACE, THE DEFENDANT DID ON MULTIPLE OCCASIONS DID STRIKE THE INFORMANT ABOUT THE INFORMANT'S LEGS

THE DEPONENT IS FURTHER INFORMED BY THE INFORMANT THAT THE INFORMANT'S BIRTHDATE IS DECEMBER, 27,2012.

THE DEPONENT IS FURTHER INFORMED BY THE INFORMANT THAT THE ABOVE DESCRIBED ACTIONS CAUSED INFORMANT TO SUFFER BRUISING ABOUT THE INFORMANT'S LEGS, TO SUFFER SUBSTANTIAL PAIN AND TO BECOME ALARMED AND ANNOYED.

FALSE STATEMENTS MADE IN THIS DOCUMENT ARE PUNISHABLE AS A CLASS A MISDEMEANOR PURSUANT TO SECTION 210.45 OF THE PENAL LAW.

01-05-2021

DATE                    SIGNATURE

# EXHIBIT E1

Criminal Form 1  1/2020

PRESENT:  Honorable Edwin L Novillo

At a term of the Kings Criminal Court, County of Kings, at the Courthouse at 120
Schermerhorn St., Brooklyn, NY 11201, State of New York

**ORDER OF PROTECTION**
Family Offenses - C.P.L. §530.12

**PEOPLE OF THE STATE OF NEW YORK**
          - against -

**JOSHUA RODRIGUEZ ,**
Defendant

DOB:  12/04/1986

☐ Youthful Offender (check if applicable)

Part: APAR1          Case No.:  CR-000541-21KN

Charges: PL 120.05 02 DF Aslt W/Int Cause Ph Inj W/Weap, 6 count(s) of D Fel, 6 count(s) of
A Misd, 3 count(s) of B Misd

Defendant Present in Court

**NOTICE: YOUR FAILURE TO OBEY THIS ORDER MAY SUBJECT YOU TO MANDATORY ARREST AND CRIMINAL PROSECUTION WHICH MAY RESULT IN YOUR INCARCERATION FOR UP TO SEVEN YEARS FOR CONTEMPT OF COURT. IF THIS IS A TEMPORARY ORDER OF PROTECTION AND YOU FAIL TO APPEAR IN COURT WHEN YOU ARE REQUIRED TO DO SO, THIS ORDER MAY BE EXTENDED IN YOUR ABSENCE AND CONTINUE IN EFFECT UNTIL A NEW DATE SET BY THE COURT.**

**THIS ORDER OF PROTECTION WILL REMAIN IN EFFECT EVEN IF THE PROTECTED PARTY HAS, OR CONSENTS TO HAVE, CONTACT OR COMMUNICATION WITH THE PARTY AGAINST WHOM THE ORDER IS ISSUED. THIS ORDER OF PROTECTION CAN ONLY BE MODIFIED OR TERMINATED BY THE COURT. THE PROTECTED PARTY CANNOT BE HELD TO VIOLATE THIS ORDER NOR BE ARRESTED FOR VIOLATING THIS ORDER .**

☒ **TEMPORARY ORDER OF PROTECTION** - Whereas good cause has been shown for the issuance of a temporary order of protection
[as a condition of: recognizance]

☐ **ORDER OF PROTECTION** - Whereas defendant has been convicted of [specify crime or violation]:

. And the Court having made a determination in accordance with section 530.12 of the Criminal Procedure Law.

IT IS HEREBY ORDERED that the above-named defendant JOSHUA RODRIGUEZ (DOB: 12/04/1986) observe the following
conditions of behavior:

[01]   Stay away from [A]   L█████ R█████████

[B]   the home of L█████ R█████████,

[C]   the school of L█████ R█████████,

[D]   the business of L█████ R█████████

[E]   the place of employment of L█████ R█████████

[14]   Refrain from communication or any other contact by mail, telephone, e-mail, voice-mail or other electronic or any other means with
L█████ R█████████,

[02]   Refrain from assault, stalking, harassment, aggravated harassment, menacing, reckless endangerment, strangulation, criminal
obstruction or breathing or circulation, disorderly conduct, criminal mischief, sexual abuse, sexual misconduct, forcible touching,
intimidation, threats, identity theft, grand larceny, coercion, unlawful dissemination or publication of intimate image(s) or any criminal
offense against L█████ R█████████

[12]   Surrender any and all handguns, pistols, revolvers, rifles, shotguns and other firearms owned or possessed, including, but not limited to,
the following: ALL FIREARMS and do not obtain any further guns or other firearms.  Such surrender shall take place immediately, but
in no event later than IMMEDIATELY at LOCAL PRECINCT.

[99]   Observe such other conditions as are necessary to further the purposes of protection: NO THIRD PARTY CONTACT.

[99]   Observe such other conditions as are necessary to further the purposes of protection: SUBJECT TO SUPREME COURT ORDERS
AND/OR FAMILY COURT ORDERS RE: CUSTODY & VISITATION;

IT IS FURTHER ORDERED that the above-named Defendant's license to carry, possess, repair, sell or otherwise dispose of a firearm or
firearms, if any, pursuant to Penal Law §400.00, is hereby [13A] suspended, and [13C] the Defendant shall remain ineligible to receive a
firearm license during the period of this order.

IT IS FURTHER ORDERED that this order of protection shall remain in force until and including 07/31/2021, but if you fail to appear in
court on this date, the order may be extended and continue in effect until a new date set by the Court.

DATED: 01/06/2021

☒ Defendant advised in Court of issuance and contents of Order.

☒ Order to be served by other means [specify]: Other

☐ Warrant issued for Defendant

☒ Order personally served on Defendant in Court

Honorable Edwin L Novillo

(Defendant's Signature)

☒ **ADDITIONAL SERVICE INFORMATION:** Other: Virtual Arraignment

The Criminal Procedure Law provides that presentation of a copy of this order of protection to any police officer or peace officer acting pursuant to his or her special duties
shall authorize and in some situations may require, such officer to arrest a defendant who is alleged to have violated its terms and to bring him or her before the Court to face
penalties authorized by law.
Federal law requires that this order be honored and enforced by state and tribal courts, including courts of a state, the District of Columbia, a commonwealth, territory or
possession of the United States, if the person against whom the order is sought is an intimate partner of the protected party and has been or will be afforded reasonable notice and
opportunity to be heard in accordance with state law sufficient to protect that person's rights (18 USC §§2265, 2266)
It is a federal crime to:
• cross state lines to violate this order or to stalk, harass or commit domestic violence against an intimate partner or family member.
• buy, possess or transfer a handgun, rifle, shotgun or other firearm or ammunition while this Order remains in effect (Note, there is a limited exception for military or law
enforcement officers but only while they are on duty); and
• buy, possess or transfer a handgun, rifle, shotgun or other firearm or ammunition after a conviction of a domestic violence-related crime involving the use or attempted use of
physical force or a deadly weapon against an intimate partner or family member, even after this Order has expired. (18 U.S.C. 922(g)(8), §922(g)(9). 2261, 2261A, 2262).

# EXHIBIT F

CRIMINAL COURT OF THE CITY OF NEW YORK
PART DV-FC COUNTY OF KINGS

_____

THE PEOPLE OF THE STATE OF NEW YORK

     v

JOSHUA RODRIGUEZ
_____

STATE OF NEW YORK
COUNTY OF KINGS

KINGS COUNTY ASSISTANT DISTRICT ATTORNEY MEREDITH ABRAMS SAYS THAT ON OR ABOUT OR
BETWEEN NOVEMBER 1, 2020 AT 12:01 AM AND DECEMBER 31, 2020 AT 11:59 PM 811 FLUSING
AVENUE COUNTY OF KINGS, STATE OF NEW YORK,

THE DEFENDANT COMMITTED THE OFFENSE(S) OF:

| | |
|---|---|
| PL 120.00(1) | ASSAULT IN THE THIRD DEGREE (DQO) |
| PL 260.10(1) | ENDANGERING THE WELFARE OF A CHILD (DQO) |
| PL 110/120.00(1) | ATTEMPTED ASSAULT IN THE THIRD DEGREE (DQO) |
| PL 120.14(1) | MENACING IN THE SECOND DEGREE (DQO) |
| PL 120.15 | MENACING IN THE THIRD DEGREE(DQO) |
| PL 240.26(1) | HARASSMENT IN THE SECOND DEGREE |
| PL 265.01(2) | CRIMINAL POSSESSION OF A WEAPON IN THE FOURTH DEGREE |
| PL 110/120.00(1) | ATTEMPTED ASSAULT IN THE THIRD DEGREE (DQO) |

IN THAT THE DEFENDANT DID:

WITH INTENT TO CAUSE PHYSICAL INJURY TO ANOTHER PERSON, CAUSE SUCH INJURY TO SUCH
PERSON OR TO A THIRD PERSON; WITH INTENT TO CAUSE PHYSICAL INJURY TO ANOTHER PERSON,
ATTEMPT TO CAUSE SUCH INJURY TO SUCH PERSON OR TO A THIRD PERSON; BY PHYSICAL MENACE,
INTENTIONALLY PLACE OR ATTEMPT TO PLACE ANOTHER PERSON IN FEAR OF DEATH, IMMINENT
SERIOUS PHYSICAL INJURY OR PHYSICAL INJURY; WITH INTENT TO HARASS, ANNOY OR ALARM
ANOTHER PERSON, STRIKE, SHOVE, KICK OR OTHERWISE SUBJECT SUCH OTHER PERSON TO PHYSICAL
CONTACT, OR ATTEMPT OR THREATEN TO DO THE SAME; KNOWINGLY ACT IN A MANNER LIKELY TO BE
INJURIOUS TO THE PHYSICAL, MENTAL OR MORAL WELFARE OF A CHILD LESS THAN SEVENTEEN
YEARS OLD OR DIRECT OR AUTHORIZE SUCH CHILD TO ENGAGE IN AN OCCUPATION INVOLVING A
SUBSTANTIAL RISK OF DANGER TO HIS OR HER LIFE OR HEALTH.

THE SOURCE OF DEPONENT'S INFORMATION AND THE GROUNDS FOR DEPONENT'S BELIEF ARE AS
FOLLOWS:

DEPONENT IS INFORMED BY L█████ R█████████ THAT, ON OR ABOUT THE ABOVE TIME AND PLACE,
THE DEFENDANT DID ON TWO OCCASIONS STRIKE THE INFORMANT ABOUT THE LEGS AND/OR BODY
WITH A BELT.

THE DEPONENT IS FURTHER INFORMED BY THE INFORMANT THAT THE ABOVE DESCRIBED ACTIONS
CAUSED INFORMANT TO SUFFER BRUISING ABOUT THE INFORMANT'S LEGS, TO SUFFER SUBSTANTIAL
PAIN, AND TO BECOME ALARMED AND ANNOYED.

THE DEPONENT IS FURTHER INFORMED THAT THE INFORMANT'S BIRTH DATE IS █████████████████.

FALSE STATEMENTS IN THIS DOCUMENT ARE
PUNISHABLE AS A CLASS A MISDEMEANOR PURSUANT
TO SECTION 210.45 OF THE PENAL LAW.

1/27/2021

DATE

MEREDITH ABRAMS

# EXHIBIT G

FAMILY COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

1924502

------------------------------------------------------------------x

-In the Matter of

**SUBPOENA DUCES TECUM**

L⬛⬛⬛ R⬛⬛⬛

A Child Under Eighteen Years
Of Age Alleged to be Neglected by

Docket No. NN-11958-20
Part 10

**JOSHUA
RODRIGUEZ**

Respondent.

------------------------------------------------------------------x

TO: Harlem Hospital Center
    506 Lenox Avenue
    New York, NY 10037

*WE COMMAND YOU,* That all business and excuses being laid aside, you and each of you produce before the Family Court, on August 12. 2021 @ 9:00am to the Honorable Melody Glover presiding, at 330 Jay Street, Brooklyn. New York 11201, PART 10 within five (5) days of receipt of this subpoena. any and all records in your possession. either by original or duly certified copy using the attached certification forms or precise replicas thereof Medical Records from 12/3/2020 Acct #252276343 for the child L⬛⬛ R⬛⬛ born 12/27/2012.

In lieu of a personal appearance in Court. the requirements of this subpoena may be met by delivery of all requested records being delivered by hand messenger or other method which provides proof of delivery to KREUZA GANOLLI, ESQ. 26 Court Street, Suite 514, Brooklyn, New York 11242, provided that it is received on or before the return date set forth herein. Email Service is also accepted at KGanolliEsq@gmail.com

**Please fill out the enclosed certification form and return with records which pursuant to CPRL § 2301 states that the records are the full and complete records maintained in your office and that they were made in the regular course of business, and that it is the regular course of business of this institution to make such records at the time of the events they describe.. FAILURE TO COMPLY WITH THIS SUBPOENA, WHICH IS DULY ISSUED BY AN OFFICER OF THE COURT PURSUANT TO THE F. C. A. 1038, 1046(a)(vii) and C.P.L.R. 2308(a), MAY BE PUNISHABLE AS CONTEMPT OF COURT. THIS IS A CHILD PROTECTIVE PROCEEDING AND PROMPT COMPLIANCE IS RESPECTFULLY REQUESTED.**

To the extent that the subject records contain any of the following information, all such information should be redacted prior to disclosure: (i) **confidential HIV-related information as defined under Public Health Law § 2780[7] and 10 NYCRR § 63.1(g); (ii) predisposition genetic test records and information subject to the provisions of Civil Rights Law § 79-1; (iii) reports and information concerning sexually transmitted diseases subject to the confidentiality provisions of 24 RCNY Health Code Reg. § 11.07(a) or Public Health Law §2306; and (iv) records and information concerning cases of gonorrhea, chlamydia trachomatis infection or syphilis subject to the confidentiality provisions of 10 NYCRR§ 2.32. (v) substance abuse/chemical dependency records subject to the confidentiality provisions of Mental Hygiene Law § 22.05 and/or 42 CFR part 2; and (vi) mental health and/or psychiatric records; all such information, if any, found in the requested records should be redacted prior to disclosure.**

For any questions immediately contact the issuing officer indicated below. A copy of this subpoena is to be served promptly before the return date pursuant to CPLR 2103 on all parties and counsel who have appeared in this action pursuant to CPLR 2303(a).

Dated: August 3, 2021

SO ORDERED:

*MG*

Hon. Melody Glover

KREUZA GANOLLI, ESQ.
Attorney for Respondent, Joshua Rodriguez
26 Court Street, Suite 514
Brooklyn, New York 11242
(917) 335-9530

## CERTIFICATION

I, Nelly Valentín, Director of Medical Records of Harlem Hospital Center, hereby, certify that the record attached is in the custody of and is the full and complete record of the condition, act, transaction, occurrence or events of this institution concerning:

**NAME OF PATIENT:** ████████, ████████

**ADDRESS OF PATIENT:** _____

**MEDICAL RECORD NO:** _____ 1924502 _____

I further certify that this record was made in the regular course of business of this Institution and it is in the regular course of business of this Institution to make such record, and such record was made at the time of the condition, act, transaction, occurrence or events, or within a reasonable time thereafter. The original medical record is retained in the Health Information Management Department in order to maintain the integrity of our files.

Prepared by: * _____        Date: ___ 8/9/21 ___
              Staff Signature

* _Nelly Valentín_ _____

Nelly Valentín
Director of Medical Records
Health Information Management Department
506 Lenox Avenue
New York, NY 10037
212-939-2764

* Records may contain sensitive health information including but not limited to and subject to the confidentiality protections afforded by Article 27-F of the NY Public Health Law, Article 33 of the Mental Hygiene Law, 42 CFR Part 2, and NY Civil Rights Law §79-L; all such information may be redacted/omitted to the extent necessary pursuant to federal and state law.

 

## DELEGATION OF AUTHORITY

I, Eboné M. Carrington, Chief Executive Officer of Harlem Hospital Center, certify that Nelly Valentin, Senior Associate Director of Health Information Management (A.K.A. Medical Records Department) whose signature appears below is a responsible employee of this institution.

I, hereby authorize Nelly Valentin, to certify records of this institution as the full and complete record of the condition, act, transaction, occurrence or events which have been made in the regular course of business of this institution, and it is the regular course of business of this institution to make such records at the time of the condition, act, transaction, occurrence or events, or within a reasonable time thereafter.

Eboné M. Carrington, MPA

Chief Executive Officer

Harlem Hospital Center

Date: 8-4-2021

Nelly Valentin

Senior Associate Director

Health Information Management

Harlem Hospital Center

Date: 8-4-2021

NYC
**HEALTH+**
**HOSPITALS** | Harlem

HARLEM HOSPITAL
CENTER
506 Lenox Avenue
New York NY 10037

Patient: R_____, L_____
MRN: 1924592 DOB: 12/27/2012 Sex: F
Acct #: 252276343
Admit: 12/3/2020, Discharge: 12/3/2020

---

## ED Triage note by Stacy-Ann Reid, RN at 12/03/20 2052

| | | |
|---|---|---|
| Author: Stacy-Ann Reid, RN | Service: Pediatric Emergency Dept | Author Type: Registered Nurse |
| Filed: 12/03/20 2054 | Date of Service: 12/03/20 2052 | Creation Time: 12/03/20 2052 |
| Status: Addendum | Editor: Stacy-Ann Reid, RN (Registered Nurse) | |
| Related Notes: Original Note by Stacy-Ann Reid, RN (Registered Nurse) filed at 12/03/20 2052 | | |

Being removed one home and into a next and need medical clearance before the switch. Pt accompanied by ACS worker Ms. Leslie Dunn.

"Electronically signed by Stacy-Ann Reid, RN at 12/03/20 2054"

---

## ED Dispo Note by David Mortel, MD at 12/03/20 2104

| | | |
|---|---|---|
| Author: David Mortel, MD | Service: Pediatric Emergency Dept | Author Type: Physician |
| Filed: 12/03/20 2106 | Date of Service: 12/03/20 2104 | Creation Time: 12/03/20 2104 |
| Status: Signed | Editor: David Mortel, MD (Physician) | |

Note Initiated: 12/03/2020 at 9:04 PM

**ED Disposition Note**

Diagnosis
The encounter diagnosis was Encounter for administrative examinations.

Disposition

**ED Disposition**

| ED Disposition | Comment |
|---|---|
| **Discharge** | |

Follow-Up With
No follow-up provider specified.
Home Medications No Changes
There are no discharge medications for this patient.

Home Medication Changes
**Modified Medications**
No medications on file

**Discontinued Medications**
No medications on file

Prescriptions Given This Visit
There are no discharge medications for this patient.

Consults
None
Final Assessment and Plan

7 yr old female with known past medical hx of allergies to Augmentin. Presented to the ED for medical check. Being transferred to maternal grandmother's house for foster care from dad's house. Normal exam otherwise well-appearing. Medically cleared to proceed to foster care.



**NYC HEALTH+ HOSPITALS** | Harlem HARLEM HOSPITAL CENTER
506 Lenox Avenue
New York NY 10037

Patient: R████, L████
MRN: 0924582 DOB: 12/27/2012, Sex: F
Acct #: 252276343
Admit: 12/3/2020, Discharge: 12/3/2020

---

**ED Dispo Note by David Mortel, MD at 12/03/20 2104 (continued)**

"Electronically signed by David Mortel, MD at 12/03/20 2106"

**ED Provider Notes by David Mortel, MD at 12/03/20 2107**

| | | |
|---|---|---|
| Author: David Mortel, MD | Service: Pediatric Emergency Dept | Author Type: Physician |
| Filed: 12/03/20 2111 | Date of Service: 12/03/20 2107 | Creation Time: 12/03/20 2107 |
| Status: Signed | Editor: David Mortel, MD (Physician) | |

Note Initiated: 12/03/2020 at 9:07 PM
Encounter Date: 12/3/2020

Chief Complaint:
**Chief Complaint**
Patient presents with
 • Medical Clearance

History of Present Illness:
7 yr old female with known allergy to Augmentin ("gets bumps").
Presented to the ED for placement to foster care after she was transferred to dad's because she was hit by a belt causing bruises on the left thigh allegedly by dad.
She has no signs of trauma and is otherwise well-appearing.
Denies any complaints today.

History provided by: **Patient and children's services**

History:
History reviewed. No pertinent past medical history.

History reviewed. No pertinent surgical history.

History reviewed. No pertinent family history.

**Social History**

Tobacco Use
 • Smoking status:      Never Smoker
 • Smokeless tobacco:   Never Used
Substance Use Topics
 • Alcohol use:         Not on file
 • Drug use:            Not on file

Review of Systems:
Review of Systems
Constitutional: Negative.
HENT: Negative.
Eyes: Negative.
Respiratory: Negative.
Cardiovascular: Negative.
Gastrointestinal: Negative.
Endocrine: Negative.

**ED Provider Notes by David Mortel, MD at 12/03/20 2107 (continued)**

Genitourinary: Negative.
Musculoskeletal: Negative.
Skin: Negative.
Allergic/Immunologic: Negative.
Neurological: Negative.
Hematological: Negative.
Psychiatric/Behavioral: Negative.

Physical Exam:
**Physical Exam**
Constitutional:
General: She is active.
Appearance: Normal appearance. She is well-developed.
HENT:
Head: Normocephalic and atraumatic.
Right Ear: Tympanic membrane, ear canal and external ear normal.
Left Ear: Tympanic membrane, ear canal and external ear normal.
Nose: Nose normal.
Mouth/Throat:
Mouth: Mucous membranes are moist.
Eyes:
Extraocular Movements: Extraocular movements intact.
Conjunctiva/sclera: Conjunctivae normal.
Pupils: Pupils are equal, round, and reactive to light.
Neck:
Musculoskeletal: Normal range of motion and neck supple.
Cardiovascular:
Rate and Rhythm: Normal rate and regular rhythm.
Pulses: Normal pulses.
Heart sounds: Normal heart sounds.
Pulmonary:
Effort: Pulmonary effort is normal.
Breath sounds: Normal breath sounds.
Abdominal:
General: Abdomen is flat.
Palpations: Abdomen is soft.
Musculoskeletal: Normal range of motion.
General: No swelling, tenderness, deformity or signs of injury.
Skin:
General: Skin is warm.
Capillary Refill: Capillary refill takes less than 2 seconds.
Neurological:
General: No focal deficit present.
Mental Status: She is alert and oriented for age.
Psychiatric:
Mood and Affect: Mood normal.
Behavior: Behavior normal.
Thought Content: Thought content normal.
Judgment: Judgment normal.

NYC HEALTH+ HOSPITALS

**Harlem**

HARLEM HOSPITAL CENTER
506 Lenox Avenue
New York NY 10037

Patient: R_____ L____
MRN: 1924582, DOB: 12/27/2012, Sex: F
Acct #: 252276343
Admit: 12/3/2020, Discharge: 12/3/2020

**ED Provider Notes by David Mortel, MD at 12/03/20 2107 (continued)**

## Medications:
**Patient's Medications**
No medications on file

## Allergies:
**Allergies**

| Allergen | Reactions |
|---|---|
| • Augmentin [Amoxicillin-Pot Clavulanate] | Rash |

## Vital Signs:
**Visit Vitals**

| | |
|---|---|
| BP | 114/73 (BP Location: Right arm, Patient Position: Sitting) |
| Temp | 98.5 °F (36.9 °C) (Oral) |
| Resp | 22 |
| Wt | 72 lb 12 oz (33 kg) |
| SpO2 | 98% |
| Smoking Status | Never Smoker |

## Assessment and Plan:

7 yrs old female well child with no signs of trauma being transferred to maternal grandma's mom for foster care
She is well-appearing and is medically cleared

David Mortel, MD
12/03/20 2111

"Electronically signed by David Mortel, MD at 12/03/20 2111"

---

**END OF REPORT**

---

# EXHIBIT H



Am I bugging or it says no marks?!?! 😤🤬

Yup

Just got the records just now

I am fuming!

Did they ever have that conference?

Nope

I'm tight

Don't be. You can use this in your lawsuit!

👍

iMessage

# EXHIBIT I

January 15, 2021

Joshua Rodriguez
811 Flushing Ave
Apt 16d
Brooklyn, New York 11206-4232

Dear Joshua Rodriguez :

On 12/22/2020, you were notified that you were the subject or other person named in a report of suspected child abuse or maltreatment received by the New York State Child Abuse and Maltreatment Register (State Central Register). At that time, you were informed of the investigation process conducted by the MANHATTAN County Child Protective Service and your rights in regard to this matter.

We must now inform you that this report has been "indicated" and that you are the subject of the report. This means that some credible evidence has been found to support the determination that you maltreated or abused the child(ren) named in the report. In addition to this letter, I, the undersigned caseworker, am willing to discuss in more depth the reasons for this determination and your feelings concerning this matter. Services may also be offered to assist you and your family.

Since this report has been determined to be indicated, it will remain in the New York State Child Abuse and Maltreatment Register. As you were previously informed in your notification letter, you are entitled to request a copy of all information regarding the report contained in the State Central Register. However, the Commissioner of the New York State Office of Children and Family Services and social services district official must withhold information identifying the person who made the report unless that person has consented in writing to the release of such information. In addition, the Commissioner and social services district official may withhold information identifying a person who cooperated in the investigation of the report if the Commissioner reasonably determines that the release of the information would be detrimental to that person's safety or interest.

As a subject of a report, that is a person determined to be responsible for causing or allowing to be inflicted injury, abuse or maltreatment to the child(ren) named in the report, you have the right to request the Commissioner of the New York State Office of Children and Family Services to amend (change) the record of the report if you believe that the information in the report is inaccurate. Such a request could include a request that the report be amended from being "indicated" to being "unfounded". This request must be made by you within 90 days of receiving this notice. Do not wait to receive copies of the information contained in the State Central Register if you wish to request an amendment. As a result of your request, a complete review of the record and the factors upon which an "indicated" determination was made will take place. Upon completion of this review, you will be notified by the New York State Office of Children and Family Services, in writing, of the decision made in response to your request. If the Office does not amend the record in accordance with your request or if the Commissioner does not act upon your request for an amendment of the report within 90 days of receiving this request, you will

be notified of the date when a fair hearing on your request will be held.

If you fail to request that the report be amended within 90 days, or, if upon your request, the report is not amended to be "unfounded", the information will remain in the Register until your youngest child's 28th birthday. An indicated report in the Register may be disclosed to an inquiring licensing or provider agency, pursuant to Section 424-a of the Social Services Law, if the substance of the report is found to be both supported by a fair preponderance of the evidence and relevant and reasonably related to employment or licensure in the child caring area for which you have applied. Such an indicated report may affect your ability to work or be licensed in the child care field or adopt a child or become a foster parent. The Office has developed guidelines regarding whether indicated instances of child abuse and maltreatment are relevant and reasonably related to such employment or licensure. You have the right to request these "Guidelines of Relevant and Reasonably Related" at any time. You will automatically receive them if you request amendment of the report.

If you have not yet requested a copy of the information contained within the State Central Register and desire such information, and/or if you wish to request amendment of the information regarding the report contained in the State Central Register, you may do so by sending a written request to:

> New York State Office of Children and Family Services
> Child Abuse and Maltreatment Register
> P.O. Box 4480
> Albany, New York 12204-0480

This written request should include your full name, the full name(s) of the child(ren) named in the report, your address and children's address, if different, and the Case ID and Intake Stage ID given in the upper right-hand corner of this letter.

:

Leslie Dunn
Caseworker

Kathleen Hobson
Caseworker's Supervisor

(212) 722-5954
Telephone number

 **Office of Children and Family Services**

CHILD ABUSE AND MALTREATMENT REGISTER
P.O. BOX 4480, ALBANY, NY 12204-0480

ANDREW M. CUOMO
Governor

SHEILA J. POOLE
Commissioner



January 26, 2021
Re: Case ID:          26989943
Intake Stage ID:    33331292
Date of Intake:     11/13/2020

Dear ~~Irene Redd~~

This letter is to give you the results of the investigation into a report of suspected child abuse or maltreatment investigated by the local child protective services (CPS) office. Your local CPS office determined this report to be "unfounded." This means that CPS did not find believable proof (credible evidence) that a child was abused or maltreated.

Unfounded reports are legally sealed by the New York Statewide Central Register of Child Abuse and Maltreatment (SCR). This means that the SCR will keep a record of the unfounded report, but all the information will be kept confidential and not shared with any person or organization except for the very few circumstances that State law allows. A sealed report may be made available to CPS or a State agency investigating a new report of child abuse or maltreatment involving the subject (alleged perpetrator), the child victim, or the child's sibling. A sealed unfounded report is not available to employers or licensing agencies.

Sealed reports will be expunged, which means destroyed, ten years after the date of the report and will not be available to anyone in any circumstances. This will happen automatically and does not require any action by anyone.

Please note that each report is treated separately and the sealing of this particular report will not affect any other reports in which you may have been named as a subject or other person. Therefore, if you were previously advised that a different report had been "indicated," then that report will remain in the SCR and will not be sealed. If you are receiving services as the result of a different report, this finding does not change those services.

If you have any questions regarding this letter, please contact 1-844-337-6298 between 8:00 am and 5:00 pm, Monday through Friday, excluding holidays, or write to the Statewide Central Register (address listed above) and include a copy of this letter or the Case ID and Stage ID in your letter. Those ID numbers are located in the upper right-hand corner of this letter.

Sincerely,

New York State Office of Children and Family Services



#111

**English**
This is an important notice. If you cannot read English, the (Arabic)(Chinese)(Haitian Creole)(Italian)(Korean)(Russian)(Spanish)(Vietnamese)(Yiddish) translation of this notice is at: http://ocfs.ny.gov/main/cps/resources.asp

**Arabic**

إن هذا الإخطار المهم. إذا كنت لا تستطيع قراءة اللغة الإنجليزية، فإن الترجمة العربية لهذا الإخطار موجودة على الرابط:
http://ocfs.ny.gov/main/cps/resources.asp

**Chinese (Traditional)**
這是一項重要通知。如果您無法閱讀英文, 下列網址提供有此通知的中文（繁體）翻譯：
http://ocfs.ny.gov/main/cps/resources.asp

**Haitian Creole**
Sa a se yon avi ki enpòtan. Si ou pa kapab li Anglè, w ap jwenn tradiksyon avi sa a nan an Kreyòl Ayisyen sou sitwèb: http://ocfs.ny.gov/main/cps/resources.asp

**Italian**
Questo è un avviso importante. Se non conosce l'inglese, la traduzione italiana di questo avviso si trova all'indirizzo: http://ocfs.ny.gov/main/cps/resources.asp

**Korean**
이는 중요한 통지 사항입니다. 영어를 읽을 수 없는 경우, 이 통지 사항의 한국어 번역본이 다음 링크로 제공됩니다: http://ocfs.ny.gov/main/cps/resources.asp

**Russian**
Это важное уведомление. Если Вы не читаете по-английски, см. перевод данного уведомления на русский по ссылке: http://ocfs.ny.gov/main/cps/resources.asp

**Spanish**
Esta es una notificación importante. Si usted no puede leer inglés, la traducción de esta notificación está disponible en español en: http://ocfs.ny.gov/main/cps/resources.asp

**Vietnamese**
Đây là một thông báo quan trọng. Nếu quý vị không thể đọc Tiếng Anh, bản dịch Tiếng Việt của thông báo này có tại: http://ocfs.ny.gov/main/cps/resources.asp

**Yiddish**

דאָס איז אַ וויכטיגע מעלדונג, אויב איר קענט נישט לייענען ענגליש, איז דער אידישער איבערזעצונג פון דער
מעלדונג ביי http://ocfs.ny.gov/main/cps/resources.asp

November 18, 2020

Re: Case ID: 26989943
Intake Stage ID: 33331292
Date of Intake: 11/13/2020

Ivette Rodriguez


Dear Ivette Rodriguez :

This is to inform you that you are an other person named in a report of suspected child abuse or maltreatment received by the New York State Child Abuse and Maltreatment Register (State Central Register) on 11/13/2020. This means that you have been named in the report but have not been alleged to be responsible for causing injury, abuse or maltreatment to the child(ren). This report has been transmitted to MANHATTAN County Child Protective Service for commencement of an investigation and evaluation of the report as required by the New York State Child Protective Services Act.

The Law allows the local child protective service 60 days from the time of the receipt of the report to complete a full investigation of the allegations contained within the report as well as an evaluation of the care being provided to your child(ren). You will be notified in writing of the findings of the investigation. Where appropriate, services will be offered to assist you and your family.

If the report is determined to be "unfounded" meaning that there is no credible evidence (i.e., evidence worthy of belief) of abuse or maltreatment, all information which would identify the subject(s) or other persons named in the report will be legally sealed by the State Central Register and the local child protective service. An "unfounded" report is confidential and may only be unsealed and made available under limited circumstances, including: to a local child protective service or State agency investigating a subsequent report of abuse or maltreatment involving the same subject of the report, or child named in the legally sealed, unfounded report, or the child's sibling; or to the subject of the report where the subject requests access to the "unfounded" report. If the report is determined to be "indicated" (i.e. there is some credible evidence of abuse or maltreatment to the child(ren)), the report will remain in the State Central Register and the local social services district's register.

This report is confidential and can only be released to certain authorized persons granted rights to access by State Law. As the subject of the report you have a right to request a copy of all information regarding the report contained in the State Central Register. However, the Commissioner of the New York State Office of Children and Family Services and social services district official must withhold information identifying the person who made the report unless that person has consented in writing to the release of such information. In addition, the Commissioner and social services district official may withhold information identifying a person who cooperated in the investigation of the report if the Commissioner reasonably determines that the release of this information would be detrimental to that person's safety or interest.

After the investigation is completed, if the report is determined to be "indicated" and if you are determined to be a subject of the report, you have the right to request the Commissioner of the New York State Office of Children and Family Services to amend (change) the record of the report if you believe that the report

is inaccurate. This request must be made by you within 90 days of being notified that the report is indicated.

The subject of the report is the person(s) responsible for causing or allowing to be inflicted injury, abuse or maltreatment to the child(ren).

If you wish to receive a copy of the information contained in the State Central Register, please write to:

New York State Office of Children and Family Services
Child Abuse and Maltreatment Register
P.O. Box 4480
Albany, New York 12204-0480

This written request should include your full name, the full name(s) of the child(ren) named in the report, your address and children's address, if different, and the Case ID and Intake Stage ID given in the upper right-hand corner of this letter.

S Wilkins-Burrell                          K Hobson
Caseworker                                 Caseworker's Supervisor

(212) 426-6973
Telephone number



# EXHIBIT J

# *Voice Transcript of Voice Recording:*

Plaintiff: "You took a shit on yourself the other day?"

L.R.: "No" (With a clueless voice)

Plaintiff: "You ain't doodoo on yourself the other day?"

L.R.: "No" (Clueless voice)

# EXHIBIT K

# SUPERVISION SERVICES
244 E.3rd Street, #20564, New York NY 10009
Tel: 917-293-1688 Fax: 212-673-6314 Email: SupervisionServices@yahoo.com
www.supervisionservices.net

## Introduction Letter

Supervision Services is a fully insured provider, in good standing with the National Supervised Visitation Network and a private provider of supervised visitations. We have been in operation since 2010 and currently provide supervised visitations for the Administration for Children Services (ACS), we have been a vendor for ACS for approximately 4 years. We currently have cases from ACS' Protective Diagnostic Units (PD) and Family Services Units (FSU) from various field offices from all five boroughs.

We also provide services for several Foster Care Contract agencies which include but are not limited to Little Flowers, Sheltering Arms and Children's Aide Society. Our community based visit model enables us to prepare and educate parents for real world scenarios with their children in the event that the children are reunified with their parents. We are also able to conduct visits indoors at the agencies we work with when requested. During the current COVID- 19 pandemic we are providing Tele-Health visits via video and phone. For in person cases we have a thorough safety protocol in place.

We further provide services in matters of Divorce/Custody disputes, etc. The specific services we provide consist of but are not limited to Supervised Visitations, Coaching Supervised Visitations (Parenting Skills are incorporated into the visitations) and Supervised Therapeutic Visitations (Evidenced Based Interventions are incorporated into the visitations). For Therapeutic Visitations, we facilitate one on one meetings with parents and children to assess the needs of the family. We debrief with parents at the end of each visit to review strengths and challenges. A comprehensive service plan is developed with family goals based on parent input, case planner input and monitor observations.

We serve the NYC area (all 5 boroughs) and the Westchester area. ( Additional locations may be discussed )

Supervision Services has over a decade of experience in child protection, child welfare and a myriad of other child centered social work areas. We have over 7 years of direct experience in the area of supervised visitations. All providers are unbiased and will provide safe supervised visitation services within the guidelines and standards of Supervision Services and the Supervised Visitation Network.

If you have any questions please feel free to contact us. www.supervisionservices.net

Respectfully,

*Carlos Malave*

Carlos Malave, MPA, LMSW b

Member of
Supervised Visitation Network

# SUPERVISION SERVICES

244 E. 3rd Street #20564, New York NY 10009
Tel: 917-293-1688 Fax: 212-673-6314 Email: SupervisionServices@yahoo.com
www.supervisionservices.net

## VISITATION RULES AND REGULATIONS

- [ ] ALL VISITS MUST BE CONFIRMED 24 HOURS IN ADVANCE VIA EMAIL **ONLY**.

- [ ] ANY CANCELLATIONS MUST BE MADE IN A FULL 24 HOURS IN ADVANCE OF SCHEDULED SERVICE VIA EMAIL.

- [ ] ANY VISITATIONS NOT CANCELLED WITHIN A FULL 24 HOURS IS SUBJECT TO FULL PAYMENT OF PRE-ARRANGED VISITING TIME.

- [ ] VISITATION ARRIVAL MUST BE ON TIME. (15 MINUTE GRACE PERIOD FOR LATENESS) ANY VISITATION ARRIVAL THAT EXCEEDS THE 15 MINUTE GRACE PERIOD MAY BE SUBJECT TO CANCELLATION AND **WILL** REQUIRE FULL PAYMENT OF PRE-ARRANGED VISITING TIME.

- [ ] VISITING PARENT IS RESPONSIBLE FOR ANY FEES FOR ACTIVITIES WHICH MAY INCLUDE BUT NOT LIMITED TO, TRANSPORTATION COSTS, ENTRANCES, ADMISSIONS, TICKETS ETC.

- [ ] **NO ELECTRONIC DEVICES** ARE ALLOWED TO BE IN USE DURING THE VISITATION, THIS INCLUDES BUT IS NOT LIMITED TO CELL PHONES, TABLETS, LAPTOPS, ETC.

- [ ] THERE IS ABSOLUTELY **NO** VIDEO AND/OR AUDIO RECORDING DURING ANY TIME OF THE VISITATION.

- [ ] ABSOLUTELY **NO** CELL PHONE IS USE ALLOWED DURING THE VISITATION.

- [ ] ASSIGNED MONITOR MUST OBSERVE CELL PHONES BEING POWERED OFF. IF CELL PHONES ARE **"TURNED OFF"** PRIOR TO THE VISITATION THEY MUST BE POWERED UP AND THEN POWERED OFF TO ALLOW THE MONITOR TO OBSERVE THE PROCESS.

- [ ] ADMINISTERING MEDICATION(S), INCLUDING BUT NOT LIMITED TO OVER THE COUNTER OR PRESCRIBED, DURING THE VISITATION IS **NOT** ALLOWED. ALL MEDICATIONS SHOULD BE ADMINISTERED PRIOR TO THE START OF THE VISITATION BY THE CUSTODIAL PARENT, FOSTER PARENT OR AGENCY NURSE. VISITATION MONITORS ARE NOT ALLOWED TO ADMINISTER MEDICATIONS.

- [ ] ANY INDICATION OF ALCOHOL USE, DRUG USE OR ANY OTHER OBSERVATION IN WHICH A VISITING PERSON IS SUSPECTED OF BEING UNDER THE INFLUENCE WILL RESULT IN IMMEDIATE TERMINATION OF THE VISIT.

- [ ] DURING VISITATION THERE IS TO BE NO SPEAKING IN A LANGUAGE THAT THE SUPERVISION MONITOR IS NOT FLUENT IN OR COMFORTABLE IN SPEAKING.

- [ ] MONITORS WILL ACCOMPANY THE SUPERVISED CHILD AND/OR VISITING ADULT TO THE LAVATORY TO ENSURE THE CONTINUITY OF THE SUPERVISION PROCESS THROUGHOUT THE VISITATION.

- [ ] DURING VISITATION WHISPERING OR SPEAKING IN A MANNER THAT DOES NOT ALLOW THE SUPERVISION MONITOR TO FULLY MONITOR THE CONVERSATION MAY RESULT IN THE TERMINATION OF THAT VISIT.

- [ ] HAVING ANY INDIVIDUALS WAITING DURING THE VISITATION IS NOT ALLOWED.



☐ UNDER RELATIVE CIRCUMSTANCES OTHER INDIVIDUALS, FAMILY MEMBERS OR FRIENDS MAY NOT BE ALLOWED TO PARTICIPATE IN THE VISITATION UNLESS OTHERWISE AUTHORIZED BY ACS, DSS AND/OR EXPRESSLY STIPULATED VIA COURT ORDER OR UNLESS AGREED UPON BY ALL PARTIES.

☐ ANY INDIVIDUALS THAT ARE ALLOWED TO BE PRESENT DURING THE VISITATION MUST ADHERE TO THESE RULES AND REGULATIONS. INDIVIDUALS CAN BE EXCLUDED FROM THE VISITATION PROCESS BY THE ASSIGNED MONITOR AT ANY TIME AND AT THE DISCRETION OF THE ASSIGNED MONITOR. FAILURE OF THAT INDIVIDUAL TO COOPERATE WITH THE ASSIGNED MONITOR OR ADHERE TO THE MONITOR'S REQUEST(S) WILL RESULT IN THE TERMINATION OF THE VISITATION. (*IN THE EVENT THAT VISITORS ARE ALLOWED A CASE AIDE MAY BE REQUIRED WHICH WILL RESULT IN AN ADDED FEE)

☐ AT NO POINT WILL THE ASSIGNED MONITOR BE SUBJECT TO VERBAL OR PHYSICAL ATTACKS, ASSAULTS OR BY THE VISITING PARENT OR ANY OF THE INDIVIDUALS INVOLVED IN THE VISITATION PROCESS, INCLUDING BUT NOT LIMITED TO FAMILY MEMBERS, EXTENDED FAMILY OR FRIENDS. VIOLATION OF THIS POLICY WILL RESULT IN IMMEDIATE TERMINATION OF THE VISITATION.

☐ DURING VISITATION THERE IS TO BE NO GIFT GIVING UNLESS PRIOR APPROVAL IS GRANTED AND/OR AGREED UPON BY ALL PARTIES.

☐ DURING VISITATION THERE IS TO BE NO PROMISES MADE (I.E. ANTICIPATED TIME OF UNREUNIFICATION, GIFTS, ETC)

☐ DURING VISITATION THERE IS TO BE NO CONVERSATION(S) REGARDING OTHER PARTIES, CUSTODIAL PARENTS, FOSTER PARENTS, COURT MATTERS OR ANY OTHER CONVERSATIONS THAT ARE NOT DEEMED APPROPRIATE DURING VISITATION.

☐ DURING VISITATION CORPORAL PUNISHMENT OR YELLING AT THE CHILD(REN) IS NOT ALLOWED. THE VISITATION WILL BE TERMINATED IMMEDIATELY IF CORPORAL PUNISHMENT OR ANY OTHER INAPPROPRIATE FORM OF DISCIPLINE IS OBSERVED. (SUPERVISION MONITORS ARE CHILD ABUSE MANDATED REPORTERS)

### VIOLATION(S) OF ANY OF THE ABOVE TERMS WILL RESULT IN IMMEDIATE TERMINATION OF THE VISITATION

(PLEASE READ AND CHECK ALL BOXES TO INDICATE THAT ALL RULES AND REGULATIONS ARE UNDERSTOOD AND AGREED UPON. BY SIGNING THIS DOCUMENT YOU AGREE TO ABIDE BY THE RULES AND REGULATIONS AND FURTHER AGREE THAT IF YOU FAIL TO ABIDE BY ANY OF THE RULES AND REGULATIONS THE VISIT(S) MAY BE TERMINATED AND YOU FURTHER AGREE TO MAKE FULL PAYMENT OF PRE-ARRANGED ALLOTTED VISITATION TIME)

PRINT NAME_____

SIGNATURE_____ DATE_____

WITNESS_____ DATE_____



# SUPERVISION SERVICES

**244 E.3rd Street, #20564, New York NY 10009**
**Tel: 917-293-1688  Fax: 212-673-6314 Email:** SupervisionServices@yahoo.com
**www.supervisionservices.net**

Program Director

# EXHIBIT L

FAMILY COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-----------------------------------------------------------------X
In the Matter of

L██████ R████████,                                    Docket No.:  NN-11958-20

A Child Under Eighteen Years of Age                          AFFIDAVIT IN
Alleged to be Neglected by                                   SUPPORT

JOSHUA RODRIGUEZ,

                                    Respondents.
-----------------------------------------------------------------X

STATE OF NEW YORK    )
                     )ss.:
COUNTY OF KINGS      )

JOSHUA RODRIGUEZ, being duly sworn, deposes and states:

1. I am the respondent in the above captioned child protective action.

2. I file this Affidavit in Support of my Order to Show Cause seeking a hearing pursuant to FCA 1028.

3. The current Family Court Proceedings commenced on October 5, 2020 with my filing of an Order to Show Cause based upon many concerns that I had about the care of my daughter while she was with her mother Estephani Rodriguez and the maternal grandmother, Ms. Suarez. As a result of that Order to Show Cause I was granted an Order of Temporary Custody which was ignored until such time as I was forced to file a Writ of Habeus Corpus. See attached OSC; Temp Order and Writ Petitions collectively as **Exhibit F**.

4. Thereafter the Mother, Estephani Rodriguez was granted supervised visits only through Safe Horizon which my attorney and I completed the relevant intake form for. During this time since there was a pending ACS investigation relating to my concerns from the summer, ACS case workers offered to host supervised visits for the

Mother which Referee Valme-Lundy stated she was not opposing such so long as the visits were supervised.

5. Thereafter after consulting with my attorney, I agreed to produce my daughter L██████ to the ACS field office as it has never been my intention to keep L██████ away from her mother or grandmother. My intention has only been to keep my daughter safe.

6. On August 24, 2020 my daughter reported to me that she has seen the mother's boyfriend and younger son's father, with a gun. My daughter also informed me that Ms. Rodriguez was driving an unlicensed unregistered vehicle with no insurance and what was most concerning is that in the community I saw my daughter L██████ in this vehicle in the front seat wherein the airbag sign could not even detect her based upon her young age. More concerning still was that my daughter had received chemical burns when someone (unknown) attempted or did put on fake acrylic nails on my 7 year old daughter. This was not done in a salon and caused my child damage to her fingers which went without medical attention until she was finally in my care in October 2020 after which she was prescribed Terbinafine pills which helped to alleviate the skin conditions. See attached photos as **Exhibit G.**

7. A Court Ordered Investigation was granted herein and they issued the attached Report regarding my clients concerns see attached as **Exhibit H.**

8. Upon information and belief the ACS investigation in the above allegations were determined to be FOUNDED against the mother under Case ID # 28989943, Intake Stage ID: 33211914; Date of Intake: 8/20/2020. See attached as **Exhibit I.**

9. Since this case first was filed against me, I have maintained my innocence to the allegations set forth against me. Despite this, I willingly engaged in both parenting and anger management classes and completed them successfully. I also worked with my doctor to obtain a medical marijuana card to show that I have been using marijuana medicinally due to pain as a result of a prior motor vehicle accident.

10. I have never seen or been provided with any photos or documents which support the allegations that my daughter ever had any marks or bruises while she was in my care for a little of one month. I was the one who did everything to protect my daughter, I called ACS and I came to court to notify the Court of my concerns, why would I ever then put my child in harms way.

11. The court should note that this isn't the first time I have sought court intervention because of my concerns of my daughters safety. In November 19, 2018, I filed a Petition for Custody because I was afraid for my daughters safety due to domestic violence which was occurring between the mother and her then boyfriend which was also leading to threats being made to the maternal grandmother. That case was dismissed as we all worked together at an agreeable arrangement for the child. However during those proceedings, L███ lived with me for approximately 6 months.

12. A prior application has not been made for the relief sought herein.

X _____
JOSHUA RODRIGUEZ

Sworn to before me this 25 day of March, 2021.

SUHAIL C. JORGE
Notary Public, State of New York
No. 01JO6376817
Qualified in Kings County
Commission Expires June 18, 20 22

# EXHIBIT M

# FTC Summary Report

| Date of Request: | 5/18/2021 | | | Date of conference: | 5/25/2021 |
|---|---|---|---|---|---|
| Case Planning agency: | JCCA | | | Director: | Rebecca Price |
| Case Planner | Myrcie Joseph | | | Supervisor: | Corrie DiBello |
| | Estephanie Rodriguez | | | | |
| Case Name: | | | | Case Number | 6970186 |
| CID: | 12/3/2021 | | | Facilitator: | Marsha Skeen |
| Family Court: | Kings | | | Permanency Specialist: | |

**\* Conference Type:**

| Placement Preservation | X | Reunification/Discharge | | APPLA (Goal Change) | |
|---|---|---|---|---|---|
| Adoption (Goal Change) | | Adult Residential Care (Goal Change) | | Permanency Planning | |

**Conference Location:**

| Children's Services | | Provider Agency | | Community Site | |
|---|---|---|---|---|---|

---

**Reason for Conference (Current Situation, incl. current length of placement)**

The agency scheduled a Final Discharge Conference to reunite L████ with biological mother Estephanie Rodriguez. On 4/23/2021, Family Court released L████ to biological mother Estephanie Rodriguez with court ordered supervision. B/M is a nonrespondent on this case.

L████ came into care due to a Neglect petition filed against biological father, Joshua Rodriguez. B/M and B/F have extensive history with ACS due to allegations of domestic abuse. B/M has a FOOP against B/F. There is a criminal court LOOP against B/F for Landon.

According to the case planning agency, B/F was completed parenting skills and anger management classes. B/F is refusing to comply with agency supervised visitation with London currently. B/F expressed that he wants the FSU case to be transferred to Brooklyn.

L████ is enrolled in school. L████ medicals are up to date.

---

**2. Child(ren) Referred**

| Child | Age | DOB | CIN | PPG | Initial Placement Dt. |
|---|---|---|---|---|---|
| L████ R████ | 8 | 10████ | GP99982J | 01 | 3/8/2021 |

nference Consensus and follow-up details:  Who does what?

---

**Conference Recommendation and Rationale**

The team reached consensus that London will be released to B/M as per court order with court ordered supervision and comply with announced and unannounced ACS visits, B/F will attend agency supervised visitation with L████.

| Action Steps (Please Include Safety/Risk Plan) | | |
|---|---|---|
| Who | What | By When |
| C/P, F/M | The team reached consensus that L████ will be released to B/M as per court order with court ordered supervision and comply with announced and unannounced ACS visits. | 6/4/2021 |
| B/F | B/F will comply with agency supervised visitation with L████ | ongoing |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| Signatures of Participants | | | |
|---|---|---|---|
| Print Name | Relationship to Child | Signature | Telephone # |
| Marsha Skeen | Facilitator | Video Conference | 646-584-6669 |
| Rebecca Price | C/P Supervisor | Video Conference | |
| Mrycie Joseph | C/P | Video Conference | |
| Joshua Rodriguez | Father | Video Conference | |
| Marie N. Renelus-Wray | FSU/CPS | Video Conference | |
| | | | |
| | | | |
| | | | |

# EXHIBIT N


# City of New York Correspondence Update: #EC-00305467

Correspondence #: EC-00305467
Date Submitted :6/14/2021 7:37:33 PM

Thank you for contacting the City of New York. We sent your correspondence to the appropriate agency for action.

You can get correspondence details here:

**_https://portal.311.nyc.gov/ correspondence-details/? id=cc12b07d-69cd-eb11- bacc-00224820978a_**

---

This e-mail, including any attachments, may be confidential, privileged or otherwise legally protected. It is intended only for the addressee. If you received this e-


# City of New York Correspondence Update: #EC-00308862

Correspondence #: EC-00308862
Date Submitted :6/22/2021 1:50:30 PM

Thank you for contacting the City of New York. We sent your correspondence to the appropriate agency for action.

You can get correspondence details here:

*https://portal.311.nyc.gov/*
*correspondence-details/?*
*id=52097955-82d3-eb11-*
*bacc-0022482385c0*

---

This e-mail, including any attachments, may be confidential, privileged or otherwise legally protected. It is intended only for the addressee. If you received this e-mail in error or from someone who was not authorized to

# EXHIBIT O

At a term of the Family Court of the
State of New York, held in and for
the County of Kings, at 330 Jay
Street, Brooklyn, NY 11201, on
August 13, 2021

**PRESENT:** Hon. Melody Glover

In the Matter of

L R (DOB: 12 27 2012),

A Child under Eighteen Years of Age
Alleged to be Neglected by

**Joshua Rodriguez,**

<div align="center">Respondent.</div>

**File #:**     293639
**Docket #:**   NN-11958-20

**CPS #:**      6970186

**ORDER OF DISMISSAL**

A petition under Article 10 of the Family Court Act, having been filed in this Court on December 4, 2020 for the following: Neglect:

And the matter having duly come on to be heard before this Court and the following having appeared: Colin Johnson, Esq., Cindy Mendelson, Esq., Kreuza Ganolli, Esq., Estephani Rodriguez and Joshua Rodriguez and Elizabeth Verillo, Esq.

NOW, after examination and inquiry into the facts and circumstances of the case, it is hereby

ADJUDGED that the petition is dismissed due to withdrawal of petition; it is therefore

ORDERED that the petition herein is withdrawn and dismissed without prejudice.

PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE ATTORNEY FOR THE CHILD UPON THE APPELLANT, WHICHEVER IS EARLIEST.

**Dated:** August 13, 2021                    **ENTER**

**Hon. Melody Glover**

# EXHIBIT P



# KINGS CRIMINAL COURT

120 Schermerhorn St., Brooklyn, NY 11201

Phone: (646) 386-4500 Fax: (718) 643-7733

Court ORI: NY023033J

**FEE**

Non-Public
Version

| | |
|---|---|
| The People of the State of New York | **Certificate of Disposition** |
| vs. | Docket Number: **CR-000541-21KN** |
| **Joshua Rodriguez** | |
| | CJTN: 069532479Q |
| | NYSID: 02113942K |

Defendant DOB: **12/04/1986**     Arrest Date: **01/05/2021**     Arraignment Date: **01/06/2021**

THIS IS TO CERTIFY that the undersigned has examined the files of the **Kings Criminal Court** concerning the above entitled matter and finds the following:

| Count # | Charge | Charge Weight | Disposition | Disposition Date |
|---|---|---|---|---|
| 1 | PL 120.05 02 DF Aslt W/Int Cause Ph Inj W/Weap **SEALED 160.50** | DF | Dismissed (Motion to Dismiss Granted, Sealed 160.50) | 02/22/2021 |
| 2 | PL 120.14 01 AM Menacing-2nd:Weapon **SEALED 160.50** | AM | Dismissed (Motion to Dismiss Granted, Sealed 160.50) | 09/10/2021 |
| 3 | PL 260.10 01 AM Act In Manner Injur Child < 17 **SEALED 160.50** | AM | Dismissed (Motion to Dismiss Granted, Sealed 160.50) | 09/10/2021 |
| 4 | PL 265.01 02 AM Crim Poss Weap-4th:Int To Use **SEALED 160.50** | AM | Dismissed (Motion to Dismiss Granted, Sealed 160.50) | 09/10/2021 |
| 5 | PL 120.15 BM Menacing-3rd **SEALED 160.50** | BM | Dismissed (Motion to Dismiss Granted, Sealed 160.50) | 09/10/2021 |
| 6 | PL 240.26 01 V Harassment-2nd:Physical Cntact **SEALED 160.50** | V | Dismissed (Motion to Dismiss Granted, Sealed 160.50) | 09/10/2021 |

Charge Weight Key: I=Infraction; V=Violation; AM, BM=Class Misdemeanor; UM=Unclassified Misdemeanor; AF, BF, CF, DF, EF=Class Felony

Dated: **September 15, 2021**    _____

Chief Clerk/Clerk of the Court

## CAUTION: THIS DOCUMENT IS NOT OFFICIAL UNLESS EMBOSSED WITH THE COURT SEAL

All marijuana convictions under PL 221.05, PL 221.10, PL 221.15, PL 221.20, PL 221.35 or PL 221.40 —including any appearing on this certificate of disposition—are vacated, dismissed, sealed, and expunged. It is an unlawful discriminatory practice for any entity to make any inquiry about such an expunged conviction or to use such an expunged conviction adversely against an individual in any form of application or otherwise—unless specifically required or permitted to do so by statute. It shall be an unlawful discriminatory practice, unless specifically required or permitted by statute, for any person, agency, bureau, corporation or association, including the state and any political subdivision thereof, to make any inquiry about, whether in any form of application or otherwise, or to act upon adversely to the individual involved, any arrest or criminal accusation of such individual not then pending against that individual which was followed by a termination of that criminal action or proceeding in favor of such individual, as defined in subdivision two of section 160.50 of the criminal procedure law, or by a youthful offender adjudication, as defined in subdivision one of section 720.35 of the criminal procedure law, or by a conviction for a violation sealed pursuant to section 160.55 of the criminal procedure law or by a conviction which is sealed pursuant to section 160.58 or 160.59 of the criminal procedure law, in connection with the licensing, employment or providing of credit or insurance to such individual: provided, further, that no person shall be required to divulge information pertaining to any arrest or criminal accusation of such individual not then pending against that individual which was followed by a termination of that criminal action or proceeding in favor of such individual, as defined in subdivision two of section 160.50 of the criminal procedure law, or by a youthful offender adjudication, as defined in subdivision one of section 720.35 of the criminal procedure law, or by a conviction for a violation sealed pursuant to section 160.55 of the criminal procedure law, or by a conviction which is sealed pursuant to section 160.58 or 160.59 of the criminal procedure law. The provisions of this subdivision shall not apply to the licensing activities of governmental bodies in relation to the regulation of guns, firearms and other deadly weapons or in relation to an application for employment as a police officer or peace officer as those terms are defined in subdivisions thirty-three and thirty-four of section 1.20 of the criminal procedure law; provided further that the provisions of this subdivision shall not apply to an application for employment or membership in any law enforcement agency with respect to any arrest or criminal accusation which was followed by a youthful offender adjudication, as defined in subdivision one of section 720.35 of the criminal procedure law, or by a conviction for a violation sealed pursuant to section 160.55 of the criminal procedure law. [Executive Law § 296 (16)] Charges may not be the same as the original arrest charges.
CPL 160.50:    All official records (excluding published court decisions or opinions or records and briefs on appeal) relating to the arrest or prosecution on file with the Division of Criminal Justice Services, any court, police agency or prosecutor's office shall not be available to any person or public or private agency.

SEALED

pursuant to Section 160.50 of the CPL

# EXHIBIT Q



New York City Comptroller
Scott M. Stringer

# Personal Injury Claim Form

Electronically filed claims must be filed within 90 days of the occurrence using the Office of the NYC Comptroller's website. If the claim is not resolved within one (1) year and 90 days of the occurrence, you must start a separate legal action in a court of law before the expiration of this time period to preserve your rights.

**I am filing:** ● On behalf of myself.

○ On behalf of someone else. If on someone else's behalf, please provide the following information.

| | |
|---|---|
| Last Name: | Rodriguez |
| First Name: | Joshua |
| Relationship to the claimant: | self |

## Claimant Information

| | |
|---|---|
| *Last Name: | Rodriguez |
| *First Name: | Joshua |
| *Address: | 811 Flushing Avenue |
| Address 2: | |
| *City: | Brooklyn |
| *State: | NEW YORK |
| *Zip Code: | 11206 |
| *Country: | USA |
| Date of Birth: | *Format: MM/DD/YYYY* |
| Soc. Sec. # | |
| HICN: (Medicare #) | |
| Date of Death: | *Format: MM/DD/YYYY* |
| Phone: | |
| *Email Address: | hypebeast1204@icloud.com |
| *Retype Email Address: | hypebeast1204@icloud.com |
| Occupation: | |

City Employee?  ○ Yes  ● No  ○ NA

Gender  ● Male  ○ Female  ○ Other

## Attorney Information (If claimant is represented by attorney)

○ Attorney is filing.

| | |
|---|---|
| Firm or Last Name: | |
| Firm or First Name: | |
| Address: | |
| Address 2: | |
| City: | |
| State: | |
| Zip Code: | |
| Tax ID: | |
| Phone #: | |
| *Email Address: | |
| *Retype Email Address: | |

## The time and place where the claim arose

| | |
|---|---|
| *Date of Incident: | 09/10/2021  *Format: MM/DD/YYYY* |
| Time of Incident: | *Format: HH:MM AM/PM* |
| *Location of Incident: | Criminal Court Kings County; related incident on 8/13/2021 in Family Court Kings County |
| Address: | |
| Address 2: | |
| City: | |
| *State: | NEW YORK |
| Borough: | BROOKLYN (KINGS) |

*Denotes required fields. A Claimant OR an Attorney Email Address is required.*



New York City Comptroller
Scott M. Stringer

**\*Manner in which claim arose:**

Claimant's daughter L████ R██████ was residing with him in December 2020. On December 3, 2020, during a supervised visit at ACS with the child's mother, ACS removed the child from Claimant's custody and instituted a removal action in Family Court. The basis for this action was the knowingly false accusations of ACS workers Leslie Dunn, Kathleen Hobson and Shakia Wilkins-Burrel. This resulted in the child being removed from Claimant's home which remains in effect to this date. In addition, a Neglect Proceeding was started and eventually withdrawn on August 13, 2021.

On January 5, 2021, based on these same false accusations, Claimant was arrested and charged with felony assault and various misdemeanors including Endangering the Welfare of A Child. The criminal charges were dismissed on motion of the District Attorney on September 10, 2021.

*Denotes required field.*



| **The items of damage or injuries claimed are (include dollar amounts):** | False accusations in Family Court resulting in removal of daughter from his custody and care and being physically and emotionally separated from the child: $1,000,000<br>False arrest and malicious prosecution: $500,000 |
| --- | --- |



New York City Comptroller
Scott M. Stringer

Office of the New York City Comptroller
1 Centre Street
New York, NY  10007

## Medical Information

1st Treatment Date: | *Format: MM/DD/YYYY*
Hospital/Name:
Address:
Address 2:
City:
State:
Zip Code:
Date Treated in
Emergency Room: | *Format: MM/DD/YYYY*
Was claimant taken to hospital by
an ambulance?   ○ Yes   ○ No   ○ NA

## Employment Information (If claiming lost wages)

Employer's Name:
Address
Address 2:
City:
State:
Zip Code:
Work Days Lost:
Amount Earned
Weekly:

## Treating Physician Information

Last Name:
First Name:
Address:
Address 2:
City:
State:
Zip Code:

## Witness 1 Information

Last Name:
First Name:
Address
Address 2:
City:
State:
Zip Code: | Phone:

## Witness 2 Information

Last Name:
First Name:
Address
Address 2:
City:
State:
Zip Code: | Phone:

## Witness 3 Information

Last Name:
First Name:
Address
Address 2:
City:
State:
Zip Code: | Phone:

## Witness 4 Information

Last Name:
First Name:
Address
Address 2:
City:
State:
Zip Code: | Phone:



New York City Comptroller
Scott M. Stringer

### Complete if claim involves a NYC vehicle

**Owner of vehicle claimant was traveling in**

| | |
|---|---|
| Last Name: | |
| First Name: | |
| Address | |
| Address 2: | |
| City: | |
| State: | |
| Zip Code: | |

**Non-City vehicle driver**

| | |
|---|---|
| Last Name: | |
| First Name: | |
| Address | |
| Address 2: | |
| City: | |
| State: | |
| Zip Code: | |

**Insurance Information**

| | |
|---|---|
| Insurance Company Name: | |
| Address | |
| Address 2: | |
| City: | |
| State: | |
| Zip Code: | |
| Policy #: | |
| Phone #: | |

**Non-City vehicle information**

| | |
|---|---|
| Make, Model, Year of Vehicle: | |
| Plate #: | |
| VIN #: | |

**City vehicle information**

| | |
|---|---|
| Plate #: | |
| City Driver Last Name: | |
| City Driver First Name: | |

**Description of claimant:**
- ○ Driver
- ○ Passenger
- ○ Pedestrian
- ○ Bicyclist
- ○ Motorcyclist
- ○ Other

**Total Amount Claimed:** [ $1,500,000.00 ]  Format: Do not include "$" or ",".

*The **Total Amount Claimed** can only be entered once the following required fields are entered:*

*Claimant Last Name*
*Claimant First Name*
*Claimant Address, City, State, Zip Code, and Country*
*Claimant Email or Attorney Email*
*Date of Incident*
*Location of Incident (including State)*
*Manner in which claim arose*

*I certify that all information contained in this notice is true and correct to the best of my knowledge and belief. I understand that the willful making of any false statement of material fact herein will subject me to criminal penalties and civil liabilities.*

# EXHIBIT Q1

2    matter going on pertaining to your child

3    currently?

4           A     Yes.

5           Q     All right.

6                 So that was just the -- the

7    removal was dismissed in August 13, 2021.  So

8    that proceeding is no longer going on.

9                 Are there any other court

10   proceedings that came out of this that --

11          A     They -- Ms. Dunn -- I had police

12   knocking on my door, and it was under SVU

13   case that Ms. Dunn put on me.

14          Q     So the removal proceeding also

15   had ACS refer you for criminal charges?

16          A     Yes.  Yes.

17          Q     SVU means Special Victims Unit, I

18   presume?

19          A     Yes.

20          Q     Were you charged?

21          A     I was -- I had -- I was charged

22   with five misdemeanors and one felony, and

23   everything got dismissed.

24          Q     Those were all child abuse

25   related felonies and misdemeanors?

2          A    Yes.

3          Q    Those charges were dismissed

4    when?

5          A    Those charges were dismissed on

6    September 10, 2021.

7          Q    September?

8          A    September.

9          Q    All right.

10              So out of this emergency petition

11   that you filed somewhere after August 2020,

12   the emergency removal has since been

13   dismissed, and the criminal charges against

14   you have been dismissed, correct?

15         A    Yes.

16         Q    What about your emergency

17   application, is that still going on in court?

18         A    I can't clarify that because I

19   don't know exactly what was done with that,

20   but it's -- they put it -- I have -- I put in

21   a petition for the same thing, for the same

22   matters.

23         Q    So I presume they all kind of

24   merged together in the family court?

25         A    I'm not too sure.  That's why I

# EXHIBIT Q2

50-H HEARING

RODRIGUEZ, JOSHUA

BLA#: 2021PI031685

015-220

----------------------------------------------x

In the Matter of the Claim of

JOSHUA RODRIGUEZ,

       -against-

THE CITY OF NEW YORK.

----------------------------------------------x

VIDEO CONFERENCE VIA ZOOM
Conducted by:
LEX REPORTING SERVICE
160 Broadway
New York, New York

March 2, 2022
9:01 a.m.

**EXAMINATION** of **JOSHUA RODRIGUEZ**, held at the above time and place, pursuant to Notice, taken before Anna Monchas-Gorvitz, a shorthand reporter and Notary Public within and for the State of New York.

# LEX
## REPORTING SERVICE, INC.
PROFESSIONAL REPORTING SINCE 1980
TOLL FREE 800.608.6085

LEX#174495

A p p e a r a n c e s:


      JOSHUA RODRIGUEZ, PRO SE
         811 Flushing Avenue, Apartment 16D
         Brooklyn, New York 11206
      E-MAIL: Hypebeast1204@icloud.com




      BROWN HUTCHINSON, LLP
         Attorneys for Respondent
         245 Park Avenue, 39th Floor
         New York, New York 10167
      BY:  WILLIAM SWIFT, ESQ.

THE REPORTER: This deposition is being conducted via Zoom video conferencing. All parties present are appearing remotely, and are confirming that they can hear and see through the video without any technical issues.

Would counsel and the witness please confirm.

MR. SWIFT: I can hear and see.

THE WITNESS: Yes.

THE REPORTER: Before I swear in the witness, I will ask counsel to stipulate on the record, that due to the national pandemic, the court reporter may swear in the deponent even though they are not in the physical presence of the deponent, and that there is no objection to that at this time, nor will there be an objection to it at a future date.

Counsel, do you agree?

MR. SWIFT: No objection.

(Whereupon, Mr. Joshua Rodriguez showed his identification.)

J O S H U A   R O D R I G U E Z, the witness

herein, having first been duly sworn by
a Notary Public of the State of New
York, was examined and testified as
follows:

EXAMINATION BY

MR. SWIFT:

        Q      State your name for the record,
please.

        A      Joshua Rodriguez.

        Q      State your address for the
record, please.

        A      811 Flushing Avenue, Apartment
16D, Brooklyn, New York 11206.

        Q      This 50-H hearing is being held
pursuant to claim number 2021PI031685, Josh
Rodriguez versus the City of New York.

                Mr. Rodriguez, my name is William
Swift and I am an attorney.  I represent the
City of New York solely for the purposes of
today's hearing.

                I'm going to ask you some
questions about a claim that you have made
against the City of New York.  If you don't
understand a question I ask you, I'm not

1
2  trying to trick you, just tell me you don't
3  understand for whatever reason, and I will
4  rephrase the question.  Okay?
5      A    Yes.
6      Q    The court reporter, Anna, that
7  you see on your screen, is taking down
8  everything that we say during this hearing.
9  She's going to put it into a book form, and
10  that's going to be read by people who
11  purportedly are smarter than I am.  So I need
12  you to answer every question with words, and
13  words only.
14          In fact, you're nodding a little
15  bit for yes, side to side for no.  We'll both
16  understand what you mean, but she's not
17  permitted to interpret those gestures.  Do
18  the best you can, everything with words.
19  Okay?
20      A    Okay.
21      Q    You don't have an attorney,
22  you're operating pro se.  I don't want to
23  give you legal advice, and I can't, but what
24  I can tell you is this; the purpose of this
25  hearing is fact finding.  I'm just here to

2    get the facts down.  I've read your Notice of

3    Claim, I understand this is an emotional

4    thing for you, but I just want you to

5    understand I'm just here to get the facts of

6    the case, you know, based on the questions

7    that I ask you.

8              So if you could answer the

9    questions to the best of your ability, and

10   only the question I ask you.  I know there's

11   a lot of the story you probably want to get

12   out.  I will afford you the opportunity to

13   add something at the end if you think I

14   didn't ask you about something that's

15   germane; but at the same time, I just want

16   you to understand that the questions I ask

17   you, and sometimes the way they come off,

18   they're not meant to antagonize you or

19   promote an emotional response.

20             I'm just looking to get the facts

21   as best I can, so I can report them to the

22   New York City Comptroller.  And they'll

23   decided what they're going to do with your

24   claim.  Okay?

25        A    Okay.

1

2          Q       Sir, I just need your date of

3    birth, but we are only going to put the year

4    listed on the record for your privacy.

5          A       The year, 1986.

6          Q       I need the whole thing, but she's

7    only going to put the year.

8          A       Oh, I'm sorry.  1986.

9          Q       Your Social Security number?

10   We'll leave that entirely off the record for

11   your privacy.

12              (Whereupon, a discussion was held

13       off the record.)

14         Q       Besides the claim we're

15   discussing today, have you ever made any

16   other claims against the City of New York or

17   any of its agencies in your life?

18         A       Yes.

19         Q       When you had made prior claims,

20   just generally, what were they about?  I

21   don't want to know all the facts, just what

22   do they generally refer to?

23         A       I was incarcerated under an alias

24   name that wasn't me.

25         Q       So it is a claim against the jail

1
2     and incarceration time?

3            A     Yes.

4            Q     What year was that?

5            A     Might have been 2012.

6            Q     Somewhere in that vicinity?

7            A     Yeah, just about ten years ago.

8            Q     Any other claims you made against

9     the City, besides that one?

10           A     No.

11           Q     Have you ever made any claims

12    against the State of New York?

13           A     No.

14           Q     This question goes to everybody,

15    not just because you revealed you had jail

16    time, but have you ever been actually

17    convicted of a crime?

18           A     No.

19           Q     I read through your Notice of

20    Claim, so I do have an idea of what's going

21    on; but like I said, this is fact finding, so

22    I'm just getting your testimony on it.  A lot

23    of the information I probably do have, you

24    know.  I'm not trying to trick you, but

25    again, there are two separate dates; the

Notice of Claim and the transcript of this
hearing.

      A    Sure.

      Q    So, to the best of your ability,
just answer from your recollection.  Okay?

      A    Okay.

      Q    The claim itself that you're
making in this claim, is there a date that
gives rise to this claim that you can tell
me?

      A    Uh --

      Q    Hold on, before you answer.  The
reason I ask is, usually, a lot of times
these claims have to do with an accident or
somebody tripped on August 1st or whatever.
You know, your claim is a little bit more
complicated.

           Do you have any dates that you
think are relevant to this claim, like when
the claim arose, to the best of your ability?

      A    This -- from the foundation, it
starts from 2018, but from what triggered the
-- I guess the problem was in November 2020.

      Q    Do you remember what date in

2    November 2020?

3          A      The 13th of November.

4          Q      What happened on November 13,

5    2020?

6          A      CPS worker, Ms. Wilkins, she came

7    and did a home visit.  I had temporary

8    custody of my child, and during the process

9    she questioned my child in a room about a

10   claim that I put in toward ACS.  And she

11   questioned my child about Hennessy liquor at

12   my kitchen in front of my mom, my sister, and

13   my -- she questioned my daughter while I was

14   there.  She interrogated my child.

15         Q      Let me just stop you there before

16   we get too far into that.

17         A      Okay.

18         Q      So on November 13, 2020,

19   Ms. Wilkins came to your home, ACS worker?

20         A      Yes.

21         Q      So had she, Ms. Wilkins, ever

22   been to your home before that?

23         A      Yes.

24         Q      Was she your case worker,

25   basically?

1
2     A     Yes.
3     Q     Why was ACS involved in the case
4  beforehand, just generally?
5     A     It was neglect.  My daughter's
6  mother left the kids alone in the car, and I
7  visualized it and made a report on it.
8     Q     So Ms. Wilkins became involved
9  due to a report you made against the child's
10 mother, general terms?
11    A     Yes.
12    Q     Ms. Wilkins would, I presume,
13 would periodically follow up on the claim at
14 least as of November 2020?
15    A     Yes.
16    Q     Do you know why Ms. Wilkins came
17 to your home that particular day?  By that, I
18 mean, was it a scheduled visit, did somebody
19 call her, or something else?
20    A     It was a home visit, and it was
21 about--  my daughter was in my temporary
22 custody, and she wasn't aware of the
23 situation.  And she came unexpectedly and
24 just randomly asking questions about my
25 child.

2        Q     Now, how old is your daughter?

3   Let's start there.

4        A     She just turned nine years old.

5        Q     What's her date of birth?

6            MR. SWIFT:   Just the year on the

7        record though, Anna.

8        A     2012.

9        Q     What's her first name?

10       A     L.

11       Q     L.?

12       A     Yes.

13       Q     That's the same last name as

14  yours?

15       A     Yes.

16           MR. SWIFT:   Just initials, Anna.

17       Anytime I refer to L., if you'll just put

18       child or L.R., I would appreciate that.

19       Just so you know, the record reflects --

20       what would you put in, Anna?

21           (whereupon, a discussion was held

22       off the record.)

23       Q     Is that your only child, L.?

24       A     Yes.

25       Q     So if I refer to the child, we'll

1

2    know that that's who we are talking about; is

3    that fair?

4            A    Yes.

5            Q    All right.

6                 So when Ms. Wilkins showed up on

7    the 13th of November 2021, do you know if

8    that was just a visit she choose to make on

9    her own just a pop-in home visit, or did

10   somebody call her with a report, or something

11   else, if you know?

12           A    Clarifying the year, it was 2020;

13   not 2021.

14           Q    I'm sorry, 2020, correct.

15           A    Yeah, she came unexpectedly.  I

16   wasn't aware of it.

17           Q    I understand that.  But do you

18   know if that was a visit, just like one of

19   those -- I understand ACS sometimes makes --

20   I don't want to say surprise, but unscheduled

21   home visits just for checking, and sometimes

22   they come due to a call, and I imagine

23   there's other reasons.

24                 Do you know if she got a specific

25   call about something or if she was just

2      making a visit?

3           A     I made a call and she just popped

4      up.

5           Q     Okay.  Okay.

6                 So, I guess, to be clear, you're

7      not aware that anybody made a report against

8      you that triggered her visit, are you?

9           A     No, I made the report.

10          Q     Well, you made the initial report

11     that got Ms. Wilkins involved?

12          A     Yes.

13          Q     Did you make any reports after

14     the initial that got Ms. Wilkins involved in

15     the first place?

16          A     Yes, I made a secondary call.

17          Q     Do you remember when that was

18     about?

19          A     That was the same day, November

20     13, 2020.

21          Q     Oh, okay.  Very good.

22                The call you made on November

23     13th, what was your complaint at that time,

24     what was the problem at the time?

25          A     I was -- there was a -- my

2    daughter's mother, she crashed the car.  My

3    daughter wasn't inside the car, her little

4    brother was inside the car, and my daughter

5    explained to my mother, which I have a record

6    of that -- the car accident.

7          Q     All right.

8                Now, you're daughter's little

9    brother, that is not your son?

10         A     No.

11         Q     That's somebody else's?

12         A     Yes.

13         Q     So you became aware that your

14   daughter's mother crashed the car?

15         A     (No verbal response.)

16         Q     Well, what's her name?  What's

17   your daughter's mother's name, to make it

18   easier?

19         A     Estephani, with an E.

20         Q     What's her last name?

21         A     Common, same thing, Rodriguez.

22         Q     Were you guys married or no?

23         A     No, it's just a common last name.

24         Q     I know that, I --

25         A     It's a coincidence of life.

Q      I'll be honest with you, every
time I go into a Brooklyn courthouse, there's
a couple of names that will be on ten times
on the calendar; one of them is always
Rodriguez.

So your understanding, you came
to learn that Estephani crashed her car with
L.'s little brother in the vehicle?

A      Yes.

Q      You called CPS just to inform
them that that happened?

A      Yes.

Q      Was there anything about the car
accident that troubled you?  By that, I mean,
other than that happening, obviously, but
what --

A      Well, the claim before, in August
of 2020, that I put in, I think it was August
20th to be exact, if I'm not mistaken, or
August 22nd, either or.  And part of that
claim was the mother driving without a
driver's license, and that was my complaint.
So, part of that is part of the issue.

Q      All right.

1
2          So if I understand you correctly,
3   you were concerned that she was still
4   driving, despite the fact that you believe
5   she doesn't have a driver's license; is that
6   a fair statement?

7          A     Yes.

8          Q     So you called CPS to inform them,
9   and Ms. Wilkins -- did you call Ms. Wilkins
10  directly or somebody else?

11         A     No, I called ACS -- if I'm not
12  mistaken, it was Albany or I just called the
13  hotline.

14         Q     Later that day, Ms. Wilkins
15  showed up?

16         A     Yes.

17         Q     About how long did she show up
18  after you made the call?

19         A     I made the call about, I would
20  say, 12:00 in the afternoon, and she came by
21  like 6:00, 6:00 in the evening.

22         Q     Are you aware of whether or not
23  Ms. Wilkins  talked to Estephani before she
24  came to your home?

25         A     I'm not sure.

2        Q     Now, when Ms. Wilkins came to

3    your home, when she first encountered you,

4    what, if anything, did she say to you when

5    she got there?

6        A     She just came in and asked about

7    the report that I put, that I submitted.  And

8    I said, yes, those claims is true, and I

9    showed her the evidence that I had, which was

10   the recording.

11             She questioned my child, and part

12   of the claim that I -- the report that I put

13   in was about an ACS worker in the past that

14   put one of my case's  claims unfounded.  And

15   I found out the reason why he was putting the

16   cases unfounded after an appeal and he was

17   not contacting me, and I got the real -- I

18   wind up hearing the truth about what really

19   was happening.

20       Q     So, just to decipher what you

21   said, you had a prior claim made against you

22   that was ruled unfounded; is that fair?

23       A     I put a claim in, they put it

24   unfounded, yes.

25       Q     I see.

2              So you made another claim that

3      they investigated, allegedly, and it was

4      found to be unfounded?

5          A    Yes, this was in 2018.

6          Q    Okay.

7              That was a different case worker;

8      not Ms. Wilkins, correct?

9          A    Yes.

10         Q    Just give me a little bit of

11     information about what you found out.  I

12     think you alluded they found that the claim

13     was unfounded?

14         A    I used to pick up my daughter

15     from the maternal grandmother's house.  Every

16     time she used to get mad at her daughter,

17     which is my daughter's mother, she would

18     start talking.

19              And part of her talking, one day

20     of her being upset at her daughter, was

21     stating that she exploded in court and told

22     the judge that the ACS worker bribed her

23     with, I guess, a sexual relationship for him

24     to put the case unfounded.

25              His phone was subpoenaed in

2    family court, and I brought that to the

3    attention of CPS worker Wilkins and her

4    supervisor, Ms. Hobson.

5         Q    When you first made the initial

6    claim in 2018 where Ms. Wilkins became

7    involved, is that the same claim you're

8    talking about that was found unfounded or no?

9         A    No.

10        Q    So that was a different one?

11        A    Yes.

12        Q    All right.

13             Your understanding is that other

14   claim that you made in the course of

15   investigating it, the worker attempted to

16   bribe your child's mother sexually; is that a

17   fair statement?

18        A    She knew what she was doing, and

19   I guess he fell for it, and I guess that's

20   what happened.

21        Q    Well, but my point is --

22        A    I don't know.

23        Q    But your understanding, you

24   learned from your child's maternal

25   grandmother of some sort of, let's say

1
2  unprofessional relationship between the
3  worker and your child's mother; is that a
4  fair statement, to make it generally?
5          A     Yes.
6          Q     Ultimately, that claim was found
7  unfounded, but you believe that had something
8  to do with this relationship; is that a fair
9  statement?
10         A     Yes.
11         Q     All right.
12               So Ms. Wilkins shows up on the
13 13th and started asking you about the call
14 that you had made that day, correct?
15         A     Yes.
16         Q     You also started discussing --
17 you discussed with her that other unfounded
18 claim during that conversation?
19         A     Yes.
20         Q     All right.
21               I presume you explained to her
22 everything you just told me about what you
23 believe of why the claim was unfounded; is
24 that a fair statement too?
25         A     Yes.

2          Q      Got it.

3                 So after Ms. Wilkins had this

4     initial conversation with you, what did she

5     do next?

6          A      She came to the kitchen.  My

7     mother, my sister was there, my daughter was

8     there --

9          Q      Let me stop you.

10                What's your mother's -- just give

11    me your mother's name.

12         A      Ivette Rodriguez.

13         Q      Ivette with a Y?

14         A      With an I.

15         Q      Your sister, what's her name?

16         A      Lori.

17         Q      L-O-R-I?

18         A      L-O-R-I, Lacombe, L-A-C-O-M-B-E.

19         Q      So your mother, your sister.

20                Who else was there?

21         A      And my daughter.

22         Q      Your daughter, we already

23    discussed that.

24         A      I claimed to the ACS worker that

25    my child has been exposed to Hennessy, you

know, and she spoke to -- she questioned my

child, if she ever tried it, what color is

it, and how you know it was.  And my daughter

explained it to her like, my mother gave it

to me, she told me it was soda, color brown.

She was explaining the questions -- like

answering the questions that Ms. Wilkins was

asking her, but interrogating her, and it

bothered me.

     Q    Okay.

          So part of what you told

Ms. Wilkins had to do with your understanding

that the mother had exposed your child to

Hennessy, the liquor; is that right?

     A    Yes.

     Q    So Ms. Wilkins is asking your

child about specifics about Hennessy and

about that allegation you made; is that a

fair statement?

     A    Yes.

     Q    So she asked her, and your child

explained -- did she question your child in

your presence or outside of your presence at

that point?

          A     In front of everyone's presence.

          Q     So that would be you, your
sister, and your mother, correct?

          A     Yes.

          Q     What else happened besides the
conversation about Hennessy?

          A     Ms. Wilkins -- well, in court,
Ms. Wilkins claimed that my mother had to
push me away as if I was aggressive, and I
never showed any --

          Q     Hold on.  Hold on.  We're getting
a little far field.

                Right now, I'm asking you about
what happened specifically on the 13th.

          A     Okay.

          Q     We'll get to what happened in the
court after that.

          A     After the questionnaire, I told
her about -- I said, you're interrogating my
child.  And she started getting loud with me,
and I raised up my voice --

          Q     Ms. Wilkins?

          A     Ms. Wilkins, yes.  I raised my
voice, but that's how I talk, I talk loud.

1

2    So she -- I told her, you guys is no help.

3    And you know what, I don't have nothing else

4    to say.  And I just exit her out of my

5    apartment nicely.

6         Q    So the conversation between L.

7    and Ms. Wilkins revolved around the Hennessy;

8    is that fair?

9         A    Yes.

10        Q    Did she question her about

11   anything else, other than Hennessy, in your

12   presence?

13        A    Before she questioned L. in the

14   room about the claims that I called in about.

15        Q    All right.

16             So, before you went and talked

17   about the Hennessy, she also spoke to L.

18   elsewhere?

19        A    Yes, in the room, confidentially,

20   and she did a body search on her.  She

21   checked her body and see if she has any

22   marked bruises.

23        Q    Let me do it this way.

24             So Ms. Wilkins came in and had

25   the conversation with you at the beginning,

```
 1
 2    that you recounted for us?
 3         A    Uh-huh.
 4         Q    Did she immediately go and have a
 5    private  conversation with L.?
 6         A    Right after.
 7         Q    So that was just L. and Ms.
 8    Wilkins that were privy to that conversation,
 9    correct?
10         A    Yes.
11         Q    How did you learn about the
12    contents of that conversation?
13         A    Clarify that.  I'm sorry.
14         Q    Sure.
15              How did you learn about what they
16    talked about?
17         A    I was listening to the door and
18    see if she was asking my daughter each
19    questions that I reported in.
20         Q    I see.
21              So you actually overheard the
22    conversation by listening through the door;
23    is that correct?
24         A    Yes.  Yes.
25         Q    As opposed to L. telling you this
```

```
 1
 2    is what she said, you actually listened to
 3    the conversation --
 4         A    Yes.
 5         Q    Okay.
 6              When you heard the conversation,
 7    well, you understand, I guess you heard her
 8    do a body search, which I presume has to do
 9    with looking for markings or signs of abuse;
10    is that what we're talking about?
11         A    Yes, that's part of the -- part
12    of when she spoke to L., that was part of the
13    --
14         Q    Is that something that was
15    typical when Ms. Wilkins would arrive, do a
16    body search?
17         A    Yes.  When she did the second
18    home visit, she did a second body search as
19    well.
20         Q    What I'm saying is, that was
21    pretty much  Ms. Wilkins' practice, to speak
22    to L. and do a body search when she would
23    visit, that's normal?
24         A    Yes.
25         Q    Then you heard Ms. Wilkins
```

questioning L. about what specifically when

she was --

    A    About her being placed alone in

the cab by herself at the age of five, and

that's the 2018 claim.

    Q    I see.

    So in November of 2020,

Ms. Wilkins was asking about the incident

that occurred in 2018?

    A    Yes, part of it.

    Q    Anything else that you overheard

Ms. Wilkins question L. about?

    A    The car accident.

    Q    Was L. present for the car

accident?

    A    No.  She overheard it from the

grandmother's -- the maternal grandmother.

    Q    So Ms. Wilkins was asking her

questions related to the car accident, as you

could understand?

    A    Yes.

    Q    Anything else of significance

that you overheard?

    A    No.  After I -- once I started

2    hearing her, like, finish talking to her, I

3    just stepped away from the door so I won't

4    get caught.

5        Q     Then they came out of the room,

6    and that's when the conversation in the

7    kitchen occurred?

8        A     Yes.

9        Q     All right.

10            So what about the questioning in

11   the kitchen, for lack of a better term, upset

12   you?  Just hang on one second.  And the

13   reason I use that term is, you said you

14   started to raise your voice and ultimately

15   you had her leave your apartment.

16       A     Yes.

17       Q     What was it that bothered you,

18   let's say, about the questioning in the

19   kitchen specifically?

20       A     I just felt like she was supposed

21   to take my daughter into the room

22   confidentially and ask her those questions.

23   She interrogated my child like as my child

24   was a criminal.  My daughter was only seven

25   years old at the time.

2       Q      Was it anything about the

3   questions she was asking, was it the tone she

4   was asking them, the --

5       A      It was the whole attitude, the

6   energy.

7       Q      It came off that she was being,

8   in your eyes, interrogated, as opposed to

9   asked in a nicer fashion?

10              Did I sum that up right?

11      A      Yes.

12      Q      Ultimately, you had a verbal

13  conversation with Ms. Wilkins that ultimately

14  led to you nicely escorting her from the

15  apartment.

16              Did I sum that up as well?

17      A      Yes, yes.  No, perfect.

18      Q      So that was November 13th.

19              What happened next?

20      A      I get a phone call from

21  Ms. Hobson, the supervisor, stating that she

22  wanted to conduct a child safety conference.

23      Q      Was that on the same day or a

24  different day?

25      A      The same day.  It was going to be

1
2    for the following week, I guess on a Tuesday,
3    and she never conducted that child safety
4    call.
5          Q      So Ms. Hobson called and wanted
6    to schedule a child safety conference, you
7    said?
8          A      Yes.
9          Q      Had you ever experienced one of
10   those before?
11         A      No.
12         Q      Did Ms. Hobson tell you where or
13   what to expect?
14         A      She just said she was going to
15   give me a call Tuesday and we'll carry on
16   from there.  She never attempt the phone
17   call.
18         Q      After that call with Ms. Hobson,
19   she never followed up with the conference,
20   correct?
21         A      Yes.
22         Q      What was the next interaction?
23         A      The next step was -- well, we
24   kept going to court, and Ms. Hobson sent me a
25   text message stating is it possible I could

1

2      bring the child over for a visit for the

3      mother, because the kid was in my temporary

4      custody.

5              So I said, I have to get the okay

6      from the courts first, because they was

7      looking for Safe Horizon to manage the visits

8      for the time being.

9          Q    Hold on.  I'm going to stop you

10     there for a second.

11             You talked about going back and

12     forth to court.  Was the court proceeding

13     initiated pursuant to this complaint that you

14     made on the 14th of November, or was there

15     just the ongoing custody deal with your

16     child?

17         A    It was the August claim, August

18     2020 claim.

19         Q    Right, but the August 2020 claim

20     that -- is that the one that was unfounded?

21         A    They didn't get to put it

22     unfounded because I went and put in a

23     petition, emergency petition, myself in

24     person in Kings Family Court.

25         Q    I think you said it was November

2018 when this started with Ms. Wilkins,

right?

     A    No, 2020.

     Q    Oh, 2020.

     A    That was Daniel Sespedas.  That

was in Queens, the 2018 claim.

     Q    Is that the one that was marked

unfounded that we're talking about or no?

     A    Yes, that's the one that had the

relationship with my daughter's mother.

     Q    I see.  I was just a little

confused.  I get it.

     So, in 2018 is when the initial

claim that had the male ACS worker that we

discussed ultimately that was unfounded, but

had a relationship with your child's mother,

correct?

     A    It was -- no, the 2018 claim was

my daughter placed alone in the cab at the

age of five from Queens to Brooklyn, from

mom's house to maternal grandmother's house,

alone by herself.

     Q    That was November 2018?

     A    I don't remember.  No, that was

2    December 2018.

3          Q     Okay.  So that was December 2018

4    is when you made that claim.

5                Is that when Ms. Wilkins became

6    involved?

7          A     No, that was the -- he put the

8    case unfounded.  I stopped going to court

9    because I had temporary custody, but the

10   child was going back to the mother due to the

11   case being unfounded.

12         Q     I see.

13               But 2018 was the claim where she

14   was put in the cab by herself, and that's

15   when the male ACS worker became involved?

16         A     Yes.

17         Q     That claim was ultimately found

18   unfounded, but you believe that was due to an

19   illicit relationship?

20         A     Yes.

21         Q     I see.  All right.

22               Then, in August 2020 is when

23   Ms. Wilkins started?

24         A     Yes.

25         Q     Just remind me again, what was

that particular claim?

        A       My daughter's hands, her nails.

And the second -- it was two claims on that,

on that.  She left the kids alone in the car,

and I witnessed it, and she was driving

without her -- she didn't have the hazard

lights and she was across the street shopping

at the shopping store, and I visualized it.

        Q       So you saw your kids left alone

in the car.

                And what about her hands and

nails?

        A       Her hands and nails, she put

acrylic nails on my daughter's nails, and a

chemical reaction cut up and gave fungus to

my daughter's nails.

        Q       I see.

                So both of these claims you made

in August 2020 that triggered Ms. Wilkins

involvement?

        A       Yes.

        Q       Now, when you were going back and

forth to court, as you referenced just a

little while ago with Ms. Hobson, that court

proceeding, was that your initial custody

proceeding, was that something triggered by

ACS, or something else while you were going

to court?

        A       I put in an emergency petition

because I felt like ACS wasn't going to do

anything about it.

        Q       Oh, I see.  Okay.

                So after the November 13, 2020

interaction, you put in an emergency

petition?

        A       No, I put in an emergency

petition in August 2020.

        Q       Oh, I see.  Okay.

                So after August 2020, you put in

an emergency petition, and that's what you

have been going back to court about?

        A       Yes.

        Q       Was it after the August 2020

complaint to ACS that you obtained temporary

custody?

        A       I had temporary custody when I

put in that emergency petition, yes.

        Q       That's what I'm saying.

2          A     Yes.

3          Q     So that petition triggered you to

4     get temporary custody?

5          A     Yes.

6          Q     Before that, your child's mother

7     had custody?

8          A     Uh-huh.

9          Q     That's a yes, right?

10         A     Yes.  Yes.

11         Q     I got it.

12               So since August 2020 and that

13    emergency petition, you had temporary custody

14    of your daughter?

15         A     Yes.

16         Q     Just so we're perfectly clear.  I

17    know we've asked it ten times, but I just

18    want to make sure we're --

19         A     No, it's okay.

20         Q     In the process of the court

21    proceeding related to that August 2020

22    emergency order is what you're talking about

23    when you said, we are going back and forth to

24    court, correct?

25         A     Yes.

1

2      Q      At the time, since that August

3   2020 petition, is when Ms. Hobson and

4   Ms. Wilkins were involved in the case with

5   your daughter; is that also correct?

6      A      Yes, from August 2020 they have

7   been involved.

8      Q      So that was a family court

9   emergency petition?

10      A      Yes.

11      Q      Okay.  Good.

12             So in the proces, I presume ACS

13   or CPS, or whatever acronym you want, they

14   would show up to these court proceedings

15   typically?

16      A      No.

17      Q      They would not?

18      A      No, not for the August and not

19   for the -- like toward November.  When they

20   put in the -- their hearing against me, it's

21   when they started appearing to court.

22      Q      But you said you went back and

23   forth to court, you got a text message from

24   Ms. Hobson.

25      A      Yes.

Q    Were you talking about the court
for the emergency petition or the one that
instituted by ACS after the November --

A    Emergency petition.

Q    Okay.

So, at that point, ACS was not
attending court?

A    No.

Q    So then, when Ms. Hobson sent you
the text message, can you explain what she
was texting you and what type of thing
concerned about?

A    No, I asked her, are you guys
going to run this case to family court.  And
she says, it's not strong enough to bring it
to family court.  But when I brought it to
family court and spoke to a supervisor during
COVID, they took it in as an emergency
petition and person, while everybody else had
to do it online, due to my proof and
evidence.

Q    Is this the second emergency
petition or this is the first one?

A    That's the first one.

Q      All right.

So is that the only one you
filed, the one in August, the emergency
petition?

A      Yes.

Q      At some point later, did ACS file
their own court claim?

A      That occurred when they did the
emergency removal.

Q      Right.  All right.  I just want
to be clear where we're at.

So you're going to the court to
adjudicate additionally on your claims from
the emergency petition, and you've been to
court a number of times from August 2020,
correct?

A      Yes.

Q      Then, Ms. Hobson was texting you
during the course of that.

Do I understand that right?

A      Yes.

Q      What was it that Ms. Hobson was
texting you about?

A      She says that she couldn't bring

2    the case to court.  She couldn't run the case
3    because it wasn't strong enough.
4            Q      This is -- the case you're
5    talking about is the complaint you made in
6    November 2020?
7            A      August.
8            Q      Well --
9            A      That's what made me put in the
10   emergency petition, because they wasn't
11   helping me out.
12           Q      Okay.
13                  So you made -- in August of 2020
14   is when you made a complaint to ACS?
15           A      Yes.
16           Q      Initially, you were texting with
17   Ms. Hobson about whether they were going to
18   institute a court case on it?
19           A      Yes.  I was trying to see if they
20   could have pushed it in before the sixty days
21   of determination, before they put the case --
22           Q      I see.
23                  So, before you filed the
24   emergency petition, you had these text
25   messages with Ms. Hobson?

2          A      Repeat that again.

3          Q      That's fine.

4                 You filed a -- you made a claim

5    to ACS in August 2020, thereabout?

6          A      Yes.

7          Q      Ms. Hobson and Ms. Wilkins were

8    assigned to the case, correct?

9          A      Yes.

10         Q      Before you filed your own

11   emergency petition in family court, you heard

12   from Ms. Hobson by text message that she

13   didn't think the case was strong enough for

14   them to bring it; is that right?

15         A      Yes.

16         Q      That's what triggered you to file

17   your own emergency petition?

18         A      Yes.

19         Q      That emergency petition resulted

20   in you getting temporary custody of the

21   child?

22         A      Yes.

23         Q      Okay.  Very good.

24                So the emergency petition issue,

25   is that resolved or is that still being

2    played out in court?

3         A     I'm still -- we still have child

4    custody case going on for --

5         Q     That, basically, is an ongoing

6    custody battle, we'll say, with your ex, your

7    daughter's mother?

8         A     Yes.

9         Q     All right.

10        A     I want to ask you a question.

11   You want me to keep going about the text

12   messages with --

13        Q     Well, yes.  I'm going to ask you

14   to make sure the record is clear.

15   Absolutely.

16        A     Okay.

17        Q     So the timeline is, you filed an

18   ACS complaint, Ms. Hobson tells you they

19   don't think it's strong enough to bring it to

20   court, so you brought it to court by

21   emergency petition and got temporary custody,

22   correct?

23        A     Yes.

24        Q     After that, what -- and then we

25   talked about in November, what happened on

2    November 13th and everything.

3                  What else happened after that,
4    that with the text messages or communications
5    with ACS?

6          A    Okay.  The text messages, she
7    kept persisting in me bringing in the child
8    to see the mother on the visit; but during
9    courts, the judge or the referee didn't give
10   the okay yet to let ACS conduct the visits.

11                 So once the judge gave the okay
12   to conduct the visits for ACS, because Safe
13   Horizon was taking too long and the mother
14   wanting visits, they let ACS conduct the
15   visits for the mother.  And she -- I told her
16   I would bring the child in in the beginning
17   of December, and she said okay.

18                 So December 1st she wanted me to
19   bring the kid in and she -- Ms. Hobson tells
20   me that the new ACS worker is no longer --
21   the new ACS worker is Ms. Dunn, and it's no
22   longer Ms. Wilkins.

23         Q    So sometime before December 2020,
24   the court said it was okay for ACS to conduct
25   the visits with the mom?

2        A     In November, the ending of
3    November.
4        Q     Right.
5              Before December 2020 is what I
6    mean.
7        A     Before, yes.
8        Q     So you made arrangements for that
9    visit, and at that time you learned from
10   Ms. Hobbs that Ms. Dunn was now the worker,
11   not Ms. Wilkins, correct?
12       A     Yes.  Yes.
13       Q     What happened next?
14       A     She couldn't conduct a visit on
15   -- I guess the appointment was going to be
16   for December 1st or December 2nd.  So she
17   says bring the kid December 3rd.  When I
18   brung my kid December 3rd, Ms. Dunn was the
19   one that retrieved my kid from my hand to
20   conduct the visit with her, but Ms. Dunn is
21   not -- I -- from my understanding, Ms. Dunn
22   is not a CPS worker, she's a CPS
23   investigator.
24       Q     Was that the last time the child
25   was in your custody?

1

2    A    Yes.

3    Q    Where did you hand the child over

4    to Ms. Dunn?

5    A    At the ACS agency at West 125th

6    Street, New York, New York.

7    Q    That was December 3, 2020?

8    A    December 3, 2020.

9    Q    When you were asked to bring her

10   over, your understanding was Ms. Dunn was the

11   new case worker and she would be conducting a

12   supervised visit with the child's mother; is

13   that right?

14   A    Yes.

15   Q    So the child hasn't been in your

16   custody since December 3, 2020?

17   A    Yes.

18   Q    So what happened after December

19   3, 2020?

20   A    Well, I'm -- December 3, 2020,

21   when I went to go pick up my child,

22   Ms. Hobson calls me five minutes before the

23   timing and tells me that they conducted an

24   emergency removal.  So, after, I called 911

25   and filed a police report against these

workers because there was no explanation.

     Q    Well, did they tell you the purpose, why the emergency removal was conducted?

     A    They didn't explain anything to me. That's why I called 911 and placed the police report.

     Q    So they just said, we've conducted an emergency removal and you're not getting the kid back? Maybe not in those words, but that's what they told you?

     A    Yes.

     Q    You called 911, and what happened with that?

     A    I placed a -- I filed a police report, and the officer which -- who's making the police report, she came back with the -- their side of the story, and part of their police report state they was going to conduct a child safety call at 10:00 a.m. from CPS worker Ms. Dunn.

     Q    That was for the following day?

     A    Yes, that was for December 4th.

     Q    Did that ever occur?

2         A    No.  I actually went to the 90th

3    Precinct, the police station by my house, and

4    put on the records, on their books, that the

5    CPS worker never made a phone call, the child

6    safety call.

7         Q    So after the call never happened,

8    you went and reported that to the police as

9    well, correct?

10        A    Yes.  Yes.

11        Q    Now, so what happened with you

12   after that, from a legal standpoint or court

13   standpoint, what happened after that?

14        A    They -- she put in a hearing, I

15   guess it's called a 1028 hearing against me.

16        Q    That's a hearing that you

17   understand to be related to the emergency

18   removal?

19        A    Yes.

20        Q    You had to go to court for that?

21        A    Yes.

22        Q    Where, what court did you go to

23   and when?

24        A    It's the same court, Kings Family

25   Court.

```
Q     Do you remember what date you
went?
A     December 4th.
Q     December 4th.  So that would be
the following day?
A     Yes.
Q     What happened at that hearing?
A     They stated that I hit my child
with a belt.  It's a bunch of allegations
that was said about me.  And when there was
no -- when we asked for --
Q     The allegations are going to be
in the court record.  I don't think you need
to put them here in the record at this point,
especially because it's a child.
      What was the outcome of the
hearing?  What did the judge decide?
A     The judge decide to continue
leaving the child where she was placed at.
Q     Where was that?
A     Maternal grandmother's house.
Q     What's her name?
A     Diana Suarez.
Q     Do you have a relationship with
```

Ms. Suarez?

     A     No more, due to this.

     Q     Were you given any visitation at
that point?

     A     No.

     Q     Have you gotten any visitation up
until today?

     A     It's -- they want me to do
forensic therapeutic -- I guess CCI
investigation, and that's --

     Q     Right, but what I'm saying is,
has the court --

     A     I'm sorry, yes, they gave me
visitation.

     Q     So you have supervised visitation
as of now?

     A     Yes.

     Q     How often does that happen?

     A     I didn't even start it because
it's due to manipulation.

     Q     When was that granted?

     A     It was granted right after -- the
supervised visits continued in -- they was
going to conduct supervised visits in

1

2  October, but they didn't --

3        Q    Let me ask you this.

4             I presume it was a family judge

5  that granted you your supervised visitations?

6        A    Yes.

7        Q    When did the family court judge

8  say you're entitled to?  Not when they

9  scheduled it, when did they say you were

10 entitled?  When were you in court that they

11 told you you could have them?

12       A    From -- that would be on December

13 10, 2020.

14       Q    So, early on, they gave you the

15 right to supervised visits, the court did?

16       A    Say that again, I'm sorry.

17       Q    Sure.

18            Early on, you were in court on

19 December 4, 2020, and by December 10, 2020

20 you were granted supervised visit rights?

21       A    Yes.  Yes.

22       Q    Have any supervised visits

23 occurred since December 10, 2020 with you?

24       A    Yes.

25       Q    How often, before it got muddled,

2    how often were you seeing your child starting
3    in December 2020?
4            A      It was off and on.
5            Q      How often, how was --
6            A      It was supposed to be two days
7    out the week.
8            Q      So two days every week you were
9    supposed to have supervised visits?
10           A      Yes.
11           Q      But that didn't happen?
12           A      It was off and on.  It was
13    excuses behind it.
14           Q      The excuses came from who?
15           A      From -- it's -- it was coming out
16    of Ms. Dunn's mouth, but there was -- she
17    stated that my child was saying that she was
18    nervous, that she was scared of seeing me or
19    something.
20           Q      I see.
21                  So Ms. Dunn was relaying to you
22    that your child was scared to see you in the
23    visits?
24           A      Yes.
25           Q      What else has happened?  Is that

2    still proceeding, that custody issue?

3            A     No, everything is dismissed.

4            Q     Well --

5            A     Oh, at that time?

6            Q     Well, hang on one second.  Let me

7    ask it more artfully.

8                  So the visits didn't occur as

9    scheduled due to the reasons you just told

10   me.

11           A     Yes.

12           Q     That emergency removal proceeding

13   at some point was dismissed?

14           A     Yes.

15           Q     When was that dismissed?

16           A     August 13, 2021.

17           Q     Despite that proceeding being

18   dismissed, the child was not placed back in

19   your custody?

20           A     Yes.

21           Q     Is the child still with the

22   maternal grandmother?

23           A     With the mother.

24           Q     Now it's with the mother?

25           A     Yes.

Q    Who made the determination that
the child will go back with the mother?

A    Ms. Dunn.

Q    So the court didn't say that,
Ms. Dunn just chose to put her back with the
mother?

A    Yeah, and she said that the
mother is okay.  And the judge gave the okay,
since Ms. Dunn gave her the okay.

Q    Do you know when it was that the
judge gave the okay to Ms. Dunn's decision?

A    If I'm not mistaken, it would
probably be like April, May.  I'm not too
sure to be exact.

Q    Of 2021?

A    Of 2021.  Maybe later.

Q    So, just so we're perfectly
clear, it was  Ms. Dunn's opinion that Mom
was okay, and the child could go back with
Mom, and the court agreed; is that fair?

A    Yes.

Q    That's the family court judge?

A    Yes.

Q    Do you still have a custody legal

matter going on pertaining to your child

currently?

        A    Yes.

        Q    All right.

             So that was just the -- the

removal was dismissed in August 13, 2021.  So

that proceeding is no longer going on.

             Are there any other court

proceedings that came out of this that --

        A    They -- Ms. Dunn -- I had police

knocking on my door, and it was under SVU

case that Ms. Dunn put on me.

        Q    So the removal proceeding also

had ACS refer you for criminal charges?

        A    Yes.  Yes.

        Q    SVU means Special Victims Unit, I

presume?

        A    Yes.

        Q    Were you charged?

        A    I was -- I had -- I was charged

with five misdemeanors and one felony, and

everything got dismissed.

        Q    Those were all child abuse

related felonies and misdemeanors?

2         A    Yes.

3         Q    Those charges were dismissed
4    when?

5         A    Those charges were dismissed on
6    September 10, 2021.

7         Q    September?

8         A    September.

9         Q    All right.

10             So out of this emergency petition
11   that you filed somewhere after August 2020,
12   the emergency removal has since been
13   dismissed, and the criminal charges against
14   you have been dismissed, correct?

15        A    Yes.

16        Q    What about your emergency
17   application, is that still going on in court?

18        A    I can't clarify that because I
19   don't know exactly what was done with that,
20   but it's -- they put it -- I have -- I put in
21   a petition for the same thing, for the same
22   matters.

23        Q    So I presume they all kind of
24   merged together in the family court?

25        A    I'm not too sure.  That's why I

1

2    don't want to say on the record.

3          Q      As of right now, you still have

4    an active case in family court for custody of

5    your daughter?

6          A      Yes.

7          Q      As of now, do you have -- what

8    kind of rights do you have to your daughter,

9    if any, whether they're being enforced or

10   not, what rights have --

11         A      No, they want to do some

12   supervised visits at -- with CFS.

13         Q      That's something that's being

14   handled in family court?

15         A      Yeah, because they want to get to

16   a determination already, the judge.

17         Q      Let me just ask you this.

18                Now, the claim that we're talking

19   about today, that you're filing against the

20   City, obviously you have a lot of issues

21   going on in a lot of different places.  You

22   know, with the family court and whatnot,

23   specifically with your daughter and the

24   custody issue.

25                Your claim against the City, in

2    general terms, is what, if you could just sum

3    it up?

4          A      The -- what I'm claiming on?

5          Q      Yes, specifically what --

6          A      I'm --

7          Q      I'm not trying to put you on the

8    spot, but what I'm asking you is this.

9                 You have a claim against the City

10   of New York that's the subject of this Notice

11   of Claim.

12                Can you just tell me, just

13   briefly, how it is you believe the City acted

14   improperly?

15         A      Well, I was treated

16   unprofessionally, and I was feeling like I

17   was being abused by things that were being

18   made up about me.

19         Q      That's on the part of who?

20         A      That's on the part of Ms. Dunn,

21   Ms. Hobson, and Ms. Wilkins.

22         Q      So ACS --

23         A      The foundation is Daniel

24   Sespedas.

25         Q      So you're -- I just want to

2    narrow it down so I could report it properly.

3              Your claim against the City is

4    that ACS acted improperly with respect to

5    your particular case?

6         A    Yes, to my -- with my rights as

7    well, yes.

8         Q    I got you.

9              Have you paid any money

10   out-of-pocket related to your claim against

11   the City?

12        A    I didn't really -- I didn't -- I

13   paid the attorney, I paid the record attorney.

14        Q    Hold on.

15             How much money did you pay the

16   attorney specifically related to the ACS

17   claim against the City, about?

18        A    About 2,500 I think it was.  No,

19   3,000 I'm sorry.

20        Q    So you paid about $3,000 in

21   attorney's fees?

22        A    Yes.

23        Q    Any other out-of-pocket outlay

24   related to your claim against the City?

25        A    Well, the most of the -- the pain

2    and suffering comes from the potential that
3    my daughter -- that she lost on her --
4          Q     I'll get to that.
5          A     Okay.  All right.
6          Q     This claim is on your behalf, not
7    your daughter's, right?
8          A     Yes.
9          Q     So for the pain and suffering, I
10   presume -- did you have any physical injuries
11   or are we talking about emotional?
12         A     I know how to control myself, you
13   know, and I didn't need anyone to help me or
14   guide through this process with me because I
15   have common sense.  So I just caught onto
16   everything, and I just knew this was --
17         Q     I'm just trying to assess the
18   level of damages you're claiming.  Again, I
19   can't get into legal advice with you, but
20   you're claiming you were wronged and you
21   claim you're being damaged, so I am just
22   trying to get to that portion of it, the
23   damaged part.
24                What I want to know is, did you
25   have any physical injuries, like bruising,

2    broken arms, or something that you went for

3    medical treatment?

4         A     Oh, no.

5         Q     Got it.

6               Did you have any emotional

7    injuries; anxiety, stress, depression, that

8    kind of thing?

9         A     Yes, all of the above.

10        Q     Got it.

11              Have you sought any treatment for

12   any of those emotional injuries up until this

13   point?

14        A     I usually conversate with friends

15   and all that, my problems; so, family.

16        Q     Did you have any formal

17   treatment?  And the reason I ask you that, if

18   you did, obviously, the City is going to want

19   records of who you saw.

20              Did you see anyone --

21        A     No, I didn't see anyone

22   professional, no.

23        Q     Those emotional issues are ongoing,

24   I presume, due to the nature of this case?

25        A     Yes, I guess.

1

2          Q      Okay.  All right.

3                 I have to ask you this.  It may

4      not apply to your case, but I ask it of

5      everyone.

6                 Do you get Medicaid or Medicare

7      yourself, sir?

8          A      I get Medicaid, UnitedHealthcare.

9          Q      Have they paid anything on your

10     behalf so far for this incident?

11         A      No.  No.

12         Q      All right.  That's really all I

13     have for you.  I do appreciate it.  I am

14     sorry that you are in the position you're in.

15     I wish you the best of luck.  Thank you for

16     answering my questions.

17                And I get it, it's an emotional

18     thing for you, I really do.  I apologize if

19     this affected you.

20         A      I missed out on two birthdays and

21     two Christmases with my child behind this

22     interference with ACS, yes.

23         Q      Understood.  I do.  I do.  You

24     know, I wish you luck in the family court

25     case and all that stuff.

Like I said, I conduct the
hearing, I report back to the comptroller
and, you know, they will do what they are
going to do from there.  I sincerely
appreciate you answering my questions.

A     Can I say anything?

Q     Sure.  Go ahead.

A     Okay.

During the time of the case of
the hearing, I requested records from Albany.
And the records from Albany, they sent me
Michael Landers, which is the little boy's
father's records.  And there was the point
where I noticed that Daniel Sespedas tampered
the records which was -- the pattern was
intake, investigation, intake, investigation.

My case number is -- which I have
the case letters, it's under intake, intake
and investigation.  Investigation is under
Michael Landers' numbers, which he duplicated
the case to put the case unfounded for her,
and the report is not on -- it is not on the
records.

So the second time I called,

2    because I told them I misplaced Michael

3    Landers, which was my records that I

4    requested the first time, and they sent me

5    Estephani Rodriguez records ACS Albany.  But

6    they don't have no records for me, I guess

7    since I asked about the records twice and

8    they sent me Michael Landers and Estephani

9    confidentially.

10        Q    I understand.

11             Well, I'm going to suggest to you

12   that the records you did receive, you

13   preserve them, you know, save them.  Don't

14   have them destroyed.  At some point, I

15   imagine the City is going to ask to see those

16   things.

17             And, you know, from there, I

18   can't advise you how to go any further, but

19   all I can ask you to do is preserve any

20   evidence which would include the records that

21   you got, any recordings that you alluded to

22   that you made, you know, all that stuff.

23   Save it.

24        A    One more before we cut this off.

25             The -- I have a recording, I was

recording Ms. Dunn, and part of the recording

is -- she stated that my daughter woke up

with diarrhea and she pooped on her way to

the visit, and I got documented behind that.

           And on the next visit, I

questioned my child.  I asked her, did you

poop on yourself, and she was clueless about

it and she didn't.  I have both recordings of

Ms. Dunn stating that she spoke to my child,

and she believes my child because she spoke

to her.  And when I spoke to my child --

because I know my child was eight years old,

I said, my daughter didn't poop on herself,

and I have the recording of my daughter

saying no, with no ideas, and as well as

being intersected.  She intersected a visit

one time, and I have the whole recording, the

visit recording as well.

      Q    I understand, I appreciate that.

Again, I'm not the adjudicator of this case.

You know that.  You know, I'm just here to

find out the facts about the claim you're

making against the City.  I got those, I

appreciate that.

All I could advise you to do is
preserve those things.  You know, do
everything you can to make sure they are not
destroyed or lost, because it's like that
they're going to be germane to your case.

          A     One last thing.  I brought it to
the Department of Investigations attention
down at 180 Maiden Lane, and I gave them all
the information on this case too, as well.

          Q     The Department of Investigations,
you made a complaint against ACS, I presume?
Is that what you're talking about?

          A     Yes.

          Q     Okay.  You provided them a lot of
the information, if not all of it, that we
just discussed, correct?

          A     I gave them everything that I had.

          Q     All right.  So they opened a file
against them, to your understanding?

          A     Yes.

          Q     Have they followed up with you on
it since your initial report so far?

          A     They told me it's confidential.
That, you know, eventually, they'll get in

contact with you to get the results --

Q     That's what I'm saying.

      Have they followed up with you

with any --

A     No.

Q     -- resolution?

A     Not yet.

Q     Very good.  Okay.

      Thank you so much, Mr. Rodriguez.

I appreciate your candid nature.  I

appreciate that.

A     Thank you.

                    -o0o-

      (Whereupon, the examination of

Joshua Rodriguez was concluded at 9:58

a.m.)

                    _____
                    JOSHUA Rodriguez


Subscribed and sworn to
before me this _____ day
of _____, 2022


_____
NOTARY PUBLIC

## C E R T I F I C A T E

I, Anna Monchas-Gorvitz, a reporter and Notary Public within and for the State of New York, do hereby certify:

That the witness(es) whose testimony is hereinbefore set forth was duly sworn by me, and the foregoing transcript is a true record of the testimony given by such witness(es).

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.


_____

ANNA MONCHAS-GORVITZ

# EXHIBIT R

1

2                 <u>ERRATA SHEET</u>

3

4    The following are my corrections to the

5    attached transcript:

6

7    <u>PAGE</u>     <u>LINE</u>    <u>SHOULD READ</u>

8    _____   *   _____    _____

9    _____   *   _____    _____

10   _____   *   _____    _____

11   _____   *   _____    See Attachments. _____

12   _____   *   _____    _____

13   _____   *   _____    _____

14   _____   *   _____    _____

15   _____   *   _____    _____

16   _____   *   _____    _____

17   _____   *   _____    _____

18   _____   *   _____    _____

19   _____   *   _____    _____

20   _____   *   _____    _____

21   _____   *   _____    _____

22   _____   *   _____    _____

23   _____   *   _____    _____

24   _____   *   _____    _____

25

# Errata Sheet:

Page: 4 Line: 16
Pursuant to the claim number 2021PI031685, Joshua

Page: 9 Line: 22
The Foundation

Page: 9 Line: 23
Starts from 2018, but what triggered

Page: 9 Line: 24
The problem was on November of 2020

Page: 10 Line: 13
My child, she questioned my daughter while I was

Page: 13 Line: 7
The 13th of November 2020, Do you know if

Page: 14 Line: 19
The Day was, November

Page: 14 Line: 25
It was about my

Page: 15 Line: 2
Daughter's mother, she crashed her car. My

Page: 15 Line: 5
Explained to my mother, which I have the recording

Page: 15 Line: 6
Of the car accident also a Re-File from 2018

Page: 15 Line: 15
Yes

Page: 15 Line: 21
Same thing Rodriguez

Page: 20 Line: 9
No Daniel Cespedes was assigned in 2018, Ms. Wilkins was assigned in 2020

Page: 25 Line: 2
I told her, you guys are no help

Page: 27 Line: 13
Procedure

Page: 32 Line: 14
Made on the 13th of November, or was there

Page: 33 Line: 6
That was Daniel Cespedes that

Page: 33 Line: 19
It was yes, the 2018 Claim was

Page: 34 Line: 7
No that was Daniel Cespedes that put the

Page: 35 Line: 7
Without No License, she didn't have the hazard

Page: 41 Line: 21
Of Determination, before they put the Case Unfounded

Page: 49 Line: 12
No photos when we asked and Medical Records

Page: 52 Line: 24
Yes but Ms. Dunn was making excuses

Page: 53 Line: 20
No

Page: 54 Line: 17
Yes 2021

Page: 58 Line: 21
Ms. Hobson, Ms. Wilkins, NYPD (SVU), and the District Attorney Office.

Page: 58 Line: 24
Cespedes

Page: 59 Line: 12
I did I've

Page: 59 Line: 13
Paid an Attorney, I paid a Private Attorney

Page: 60 Line: 16
Everything, and I knew this was all made up

Page: 61 Line: 15
And all that, my problems.

Page: 65 Line: 17
A Visit being Interjected. She Interjected a Visit.

# EXHIBIT S


**Office of Children and Family Services**

KATHY HOCHUL
Governor

SHIELA J. POOLE
Acting Commissioner

August 17, 2022

JOSHUA RODRIGUEZ
811 FLUSHING AVENUE APT. 16D
BROOKLYN, NY 11206

## NOTICE OF VIDEO APPEARANCE

Re: Child Abuse or Maltreatment Appearance
    SCR Case ID: 26989943
    Hearing ID: 119588
    Intake Stage ID: 33360442
    Oral Report Date: 12/3/2020

Dear JOSHUA RODRIGUEZ:

In response to your request for the expungement or amendment of the above-referenced indicated report(s) on file with the New York Statewide Central Register of Child Abuse and Maltreatment (State Central Register), you have been scheduled to appear:

> **October 18, 2022 at 9:30am**
> **Location: https://meetny.webex/meet/rantideva.sinhg3**
> **Judge: Rantideva Singh**

This appearance will be a video conference only. The full hearing will not be conducted on this date. However, you must appear or you will lose your right to challenge your indicated finding.

On the day and time of your conference you will need to use the above link to join the Webex video hearing room.

If a settlement is not possible, the Agency attorney will mail you copies of the documents that Agency may submit as evidence at your hearing and discuss the witnesses Agency intends to call on its behalf. You will also be required to provide Agency with the evidence you intend to introduce at the hearing in advance. Please fax or mail any documents you want the ALJ to consider as your evidence to the ALJ and the Agency attorney and tell the Agency attorney the witnesses who will be testifying on your behalf.

**If you do not appear at the conference, you will be deemed to be in default.** If you have technical difficulties at the time of the conference please call the main office number at 212-961-4408 *AND* email a description of your technical difficulties to ocfs.sm.legalaffairs.14thbsh@ocfs.ny.gov. If you do not appear in the virtual hearing room, *and you fail to contact us at the time of the hearing to report technical difficulties,* you will be deemed to be in default which means you will lose your right to a hearing and the report will remain indicated.

Adjournment requests and hearing withdrawals must be in writing, signed, and emailed to ocfs.sm.legalaffairs.14thbsh@ocfs.ny.gov or faxed to 212-961-5898 or sent to:

> New York State Office of Children & Family Services
> Bureau of Special Hearings
> 163 West 125th Street, 14th floor
> New York, New York 10027
> ATTN: ALJ Rantideva Singh

Adjournment requests made less than five days prior to the scheduled date of the hearing will not be granted except in extraordinary circumstances.

You have the right to hire an attorney or bring someone with you to help you at the hearing. If you want legal assistance and cannot afford a lawyer, you may be able to obtain free legal assistance by contacting your local legal aid organization. However, this office will not provide an attorney to represent you, nor pay for an attorney you may choose to retain.

Sincerely,

John Franklin Udochi
Supervising Administrative Law Judge

Cc:   Wendy Lattibeaudiere, Esq.
      Becky Wood-Hulbert
      Rantideva Singh



**Office of Children and Family Services**

KATHY HOCHUL
Governor

SHEILA J. POOLE
Commissioner

October 18, 2022

Joshua Rodriguez
811 Flushing Avenue Apt. 16D
Brooklyn, NY 11206
Hypebeast1204@icloud.com

## NOTICE OF VIDEO APPEARANCE

Re: Child Abuse or Maltreatment Appearance
SCR Case ID: 26989943
Hearing ID: 119588
Intake Stage ID: 33360442
Oral Report Date: 12/03/2020

Dear Joshua Rodriguez:

Please be advised that this hearing will be conducted with the use of videoconferencing technology whereby the parties and the Administrative Law Judge appear remotely by video. In response to your request for the expungement or amendment of a report in the New York State Central Register of Child Abuse and Maltreatment (State Central Register), a video hearing will be held through WebEx on:

**January 26, 2023 at 10:00 AM**
**Judge: Rantideva Singh**
**Location: https://meetny.webex.com/meet/rantideva.singh3**

**On the day and time of your hearing, click the link above or copy and paste it in a browser window on any device that has a camera. This will direct you to the hearing room.**

Adjournments:

If you are not able to appear on the above scheduled date and time and wish to have the matter moved to a future date, please call 212-961-4408 and explain the reason or email the office at ocfs.sm.legalaffairs.14thbsh@ocfs.ny.gov . You may also send a fax or send a letter to the office. For your request for a new date to be considered, you must also write and request a new date for your hearing and explain the reason you need the date moved. Please include a copy of the first page of this letter. Your letter should be sent no later than five days prior to the scheduled hearing date.

Defaults:
If you do not appear in the virtual hearing room at the above date and time and you fail to contact us at the time of the hearing to report a technical difficulty OR have not requested an adjournment in advance, you will be deemed to be in default which means you will lose your right to a hearing and the report will remain indicated in the State Central Register. If you have technical difficulties at the time of the hearing please call the call-in number in your WebEx email invitation or the main office number at 212-961-4408 AND email a description of your technical difficulties to ocfs.sm.legalaffairs.14thbsh@ocfs.ny.gov

Withdrawal:
If you wish to withdraw your request for a hearing you need to do so in writing prior to the scheduled date or do so orally on the record at the hearing. Please note that a withdrawal of your request will result in the indicated report(s) remaining on file with the State Central Register. If you withdraw your request to have a hearing, the existence of the report(s) will be disclosed to licensing and provider agencies authorized to inquire pursuant to Section 424-a of the Social Services Law.

Any written response to this letter such as a request to adjourn the matter, or withdrawing your request for a hearing should be emailed to ocfs.sm.legalaffairs.14thbsh@ocfs.ny.gov , faxed to 212-961-5898 or mailed to:

Office of Children and Family Services
Bureau of Special Hearings
163 West 125th Street, 14th Fl
New York, NY 10027

Submission of Evidence:
At the hearing, you have a right to ask the Administrative Law Judge to consider your documents as evidence and have people testify on your behalf. Please provide any and all documents that you will be asking the Administrative Law Judge to consider as evidence in advance of the hearing. You can email all the document to ocfs.sm.legalaffairs.14thbsh@ocfs.ny.gov , fax them to 212-961-5898 or mail them to the address above. Please send all the documents at the same time to avoid documents being separated. You also have the right to ask questions of the witnesses who testify against you, and to challenge the documents being asked by the other side to be considered by the Administrative Law Judge at the hearing. You must provide all documentary evidence sufficiently prior to the hearing to allow adequate review by the opposing party. Failure to submit your evidence in a timely manner may result in an adjournment of your hearing.

Right to Counsel:
You have the right to hire an attorney or bring someone with you to help you at the hearing. If you need legal assistance and cannot afford a lawyer, you may be able to obtain free legal assistance by contacting your local legal aid organization. However, this office will not appoint or provide an attorney to represent you, nor pay for an attorney you may choose to retain.

Issues to be Determined:
The issues to be decided at the hearing are: (a) whether the alleged act or acts of child abuse or maltreatment were done by you, and (b) if so, whether such act or acts are relevant and reasonably related to

employment by a child care agency, to the adoption of children or to the provision of foster care. See Social Services Law Sections 422(8) and 424-a, Valmonte v. Bane, 18 F.3d 992 (2nd Cir. 1994), and Lee "TT" v. Dowling, 87 N.Y.2d 699, 642 N.Y.S.2d 181 (1996).

For reports received by the Central Register prior to February 12, 1996, if it is decided that child abuse or maltreatment was not committed, the report will be expunged. For reports received by the Central Register on or after February 12, 1996, if it is decided that child abuse or maltreatment was not committed, the report will be amended to reflect that decision and the report will be sealed.

Sincerely,

Rantideva Singh
Administrative Law Judge

cc: John Lalindez (ACS)
Joshua Rodriguez (Appellant)

# EXHIBIT S1

In the Matter of the Appeal of

**JOSHUA RODRIGUEZ**

Pursuant to Title 6 of the Social Services Law

**DECISION**

**HID#:119588**

Before:                          Mary Pat Walsh
                                 Administrative Law Judge

Scheduled for:                   January 26, 2023 (via WebEx video)

Parties:                         New York State Central Register of
                                 Child Abuse and Maltreatment
                                 P.O. Box 4480
                                 Albany, New York 12204
                                 Documents submitted in lieu of appearance.

                                 New York City Administration for Children's Services
                                 150 William Street, Room 50-d
                                 New York, NY 10038
                                 By:     John LaLindez, Esq.

                                 Joshua Rodriguez, Pro Se Appellant
                                 811 Flushing Avenue Apt. 16d
                                 Brooklyn, NY 11206

## JURISDICTION

The New York State Central Register of Child Abuse and Maltreatment (the Central Register) maintains a report indicating Joshua Rodriguez (the Appellant) for abuse and/or maltreatment. The Appellant requested that the Central Register amend the report. The Central Register did not do so, and a hearing was then scheduled in accordance with the requirements of Social Services Law (SSL) § 422(8)(b) (i).

## FINDINGS OF FACT

An opportunity to be heard having been afforded the parties and evidence having been considered, it is hereby found:

1. The Central Register contains an "indicated" report (SCR Case Id#: 26989943, Intake Stage Id#: 33360442, dated 12/3/2020) of abuse and/or maltreatment by the Appellant.

2. The report was investigated by the New York City Administration for Children's Services (the Agency).

3. Upon completing their investigation, the report was indicated by the Agency against the Appellant for child abuse and/or maltreatment.

4. The Agency's representative advised the Administrative Law Judge via email on 1/26/2023 that it was not presenting any evidence in support of the indicated report.

5. The Agency has the burden to prove the allegation or allegations against the Appellant. Because the Agency is not offering any proof they do not meet their burden, the hearing is canceled, and the Appellant will prevail in this proceeding. The record of the report will be amended in a manner favorable to the Appellant. This is the same outcome that the Appellant would have had if the Appellant won their case after a full hearing.

## ISSUES

Is the report of child abuse and/or maltreatment by the Appellant supported by a fair preponderance of the evidence?

If such acts are established, are such acts currently relevant and reasonably related to employment in childcare or to the provision of foster or adoptive care by the Appellant?

## DISCUSSION

The Agency did not prove by a fair preponderance of the evidence that the Appellant committed the abuse and/or maltreatment alleged. Because the report will be amended there is no further action required of the Appellant. The greatest relief available to the Appellant is granted.

The Central Register submitted by mail copies of the documents it maintains in connection with this matter (State Exhibit 1), however because no hearing will be held, that submission will not be considered.

Because the Agency did not meet its burden of proving by a fair preponderance of the evidence that the Appellant committed the abuse and/or maltreatment alleged, the record of the report will be amended to unfounded and sealed.

**DECISION:**     Abuse and/or maltreatment by Joshua Rodriguez has not been established by a fair preponderance of the evidence. The State Central Register and the Agency are directed to amend to unfounded and seal the report (SCR Case Id#: 26989943, Intake Stage Id#: 33360442, dated 12/3/2020) and to take the actions required by SSL § 422(9).

This decision is made by Mary Pat Walsh, Bureau of Special Hearings, who has been designated by the Commissioner to make such decisions.

**DATED:** New York, New York
       February 6, 2023

Mary Pat Walsh
Bureau of Special Hearings


# JR HID: 119588

Good Morning Judge Walsh,

RE:        SCR# 26989943
           HID: 119588
           Intake Stage ID: 33360442
           ORT: 12/03/2020

ACS is settling the above matter by way of no evidence.

Thank you,

John A. LaLindez (he/him/his) | **Assistant Supervising Attorney**
Office of the General Counsel
Fair Hearings & Compliance Unit
**NYC Administration for Children's Services**
150 William Street, 15th Floor | New York, NY 10038
P: 212.341.0922  C: 347.415.7880
**NYC Children**



**Mary pat Walsh**

To: John   Cc: Joshua >

1/26/23

As the matter has been resolved fully in favor of the Appellant, no further appearances will be required.

A Decision favorable to the Appellant will be issued.


Mary Pat Walsh
Administrative Law Judge
Bureau of Special Hearings
Office of Children and Family Services
State Office Building
333 E. Washington St. Room 134
Syracuse, NY  13202
315-426-2149



**Office of Children
and Family Services**

**KATHY HOCHUL**
Governor

**SUZANNE MILES-GUSTAVE, ESQ.**
Acting Commissioner

February 15, 2023

Joshua Rodriguez
811 Flushing Ave. Apt. 16D
Brooklyn, NY 11206

RE: State Central Register Report of Maltreatment
    Hearing ID#: 119588

Dear Mr. Rodriguez,

Enclosed please find documents you provided to my office concerning the above matter. Because the Agency did not contest your request to have the report amended and offered no evidence, the matter was resolved in your favor without the necessity of a hearing.

This office has not retained any of the enclosed documents, as the matter was resolved without a hearing.

Sincerely,

Mary Pat Walsh
Hearing Officer

Encs: All Documents provided by Appellant

# EXHIBIT T



7/17/2023

Joshua Rodriguez
811 Flushing Avenue Apt. 16D
Brooklyn, New York 11206

Dear Mr. Rodriguez,

The New York State Office of Children and Family Services (OCFS), New York City Regional Office
(NYCRO) is in receipt of your correspondence. Your correspondence reflected concerns related to
unprofessional conduct by Child Protective Specialist and an error in the date of birth of the mother in ACS
case records.

The NYCRO would like to inform you that OCFS does not have the jurisdictional authority to discipline ACS
staff as ACS disciplines its own staff. The NYCRO recommends you contact the ACS Office of Advocacy
Parents and Children's Rights Unit (PCRU) at (212) 676-9421. The PCRU receives calls and in-person inquiries
from parents and other concerned parties who have concerns related to a child welfare case. One of the issues
they address are clarification of child welfare procedures. You may also contact the ACS Brooklyn Borough
Commissioner, Rodney Jackson at (718) 623-4975 or ACS Commissioner at (212)-341-0900.

Regarding the neglect petition, a correction of the mother's date of birth may be made by informing your
attorney of your concern and requesting a correction be made in Family Court. If you do not have an attorney,
the following web address: www.nycourthelp.gov may be of assistance in obtaining an attorney and discussing
your legal options.

Thank you for bringing this matter to our attention.

Sincerely,

Jennifer Verna
Children and Family Services Specialist I
New York City Regional Office
163 West 125th St.
New York, N.Y. 10027

# EXHIBIT U

SUPREME COURT OF THE CITY OF NEW YORK
COUNTY OF KINGS: DV-FC

THE PEOPLE OF THE STATE OF NEW YORK

-against-

JOSHUA RODRIGUEZ,
                    DEFENDANT.

AFFIDAVIT OF SWEARABILITY

DOCKET NO.: CR-000541-21KN

STATE OF NEW YORK      )
                       )ss.:
COUNTY OF KINGS        )

     I, ASSISTANT DISTRICT ATTORNEY MEREDITH ABRAMS, OF THE KINGS
COUNTY DISTRICT ATTORNEY'S OFFICE, DID INTERVIEW THE COMPLAINANT,
L███ R███████, DATE OF BIRTH 12/27/2012, AND FOUND THE
COMPLAINANT TO BE SWEARABLE, IN THAT THE COMPLAINANT UNDERSTANDS
THE NATURE AND IMPORTANCE OF THE OATH TO BE SWORN AND IS CAPABLE
OF GIVING EVIDENCE IN A COURT OF LAW.

                               FALSE STATEMENTS MADE IN THIS
DOCUMENT ARE PUNISHABLE AS A CLASS A
MISDEMEANOR PURSUANT TO SECTION
210.45 OF THE PENAL LAW.

<u>1/29/2021</u>   *Meredith Abrams*
DATE        SIGNATURE

# EXHIBIT U1

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF KINGS: PART DV-FC
-----------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK

                              SUPPORTING DEPOSITION

       -Against-


JOSHUA RODRIGUEZ,                    DOCKET NO. CR-000541-21KN


-----------------------------------------------------------------------X

STATE OF NEW YORK )
                 ) ss:
COUNTY OF KINGS   )

    I, L██████ R████████ have read the accusatory instrument filed in this action. The facts in that instrument stated to be on information furnished by me are true to my personal knowledge.


                              FALSE STATEMENTS MADE IN THIS DOCUMENT ARE
                              PUNISHABLE AS A CLASS A MISDEMEANOR
                              PURSUANT TO SECTION 210.45 OF THE PENAL LAW.


1/27/21   L████ R███████
DATE           SIGNATURE

# EXHIBIT V

# Delcar S. Savage

Badge #5757, Hispanic Female
Former Detective Grade 3 at Bronx Special
Victims Squad
Also served at Special Victims Division Zone 3,
103rd Precinct, 113th Precinct, Narcotics
Borough Queens North
Service started January 2007, ended October
2021, Tax #943021

**Substantiated Allegations:**
Abuse of Authority: Frisk
Abuse of Authority: Search (of person)
(2)
Abuse of Authority: Vehicle search

# Complaints

6  Complaints

# Complaints

6 Complaints

12 Allegations

4 Substantiated

3 Substantiated (Command Discipline B)

1 Substantiated (Formalized Training)

1 Alleged Victim Uncooperative

1 Complainant Uncooperative

1 Exonerated

3 Miscellaneous – Subject Terminated

2 Unsubstantiated

## Complaint #201805027, March 2018

**Allegation:** Abuse of Authority: Threat to notify ACS

**CCRB Conclusion:** Complainant Uncooperative

additional details

## Complaint #201506493, August 2015

**Allegation:** Abuse of Authority: Search (of person)

**Complainant:** Hispanic Female, 39

**CCRB** Substantiated (Formalized

## Complaint #201805027, March 2018

**Allegation:** Abuse of Authority: Threat to notify ACS

**CCRB Conclusion:** Complainant Uncooperative

additional details

## Complaint #201506493, August 2015

**Allegation:** Abuse of Authority: Search (of person)

**Complainant:** Hispanic Female, 39

**CCRB Conclusion:** Substantiated (Formalized Training)

**Penalty:** **Formalized Training**

additional details

## Complaint #201506377, August 2015

**Allegation:** Force: Gun Pointed

**Complainant:** Black Male, 43

**CCRB Conclusion:** Alleged Victim Uncooperative

**Documents:** Complaint Closing Report

additional details

**Documents:** Complaint Closing Report

additional details

## Complaint #201506484, July 2015

| | |
|---|---|
| **Allegation:** | Abuse of Authority: Frisk |
| **Complainant:** | Black Female, 53 |
| **CCRB Conclusion:** | Substantiated (Command Discipline B) |
| **Allegation:** | Abuse of Authority: Search (of person) |
| **Complainant:** | Black Female, 53 |
| **CCRB Conclusion:** | Substantiated (Command Discipline B) |
| **Allegation:** | Abuse of Authority: Vehicle search |
| **Complainant:** | Black Female, 53 |
| **CCRB Conclusion:** | Substantiated (Command Discipline B) |
| **Allegation:** | Abuse of Authority: Vehicle stop |
| **Complainant:** | Black Female, 53 |
| **CCRB Conclusion:** | Unsubstantiated |
| **NYPD** | No Disciplinary Action-DUP |

**CCRB
Conclusion:** Unsubstantiated

**NYPD
Conclusion:** No Disciplinary Action-DUP

**Penalty:** **No penalty**

additional details

## Complaint #200902022, February 2009

**Allegation:** Force: Pepper spray

**Complainant:** Black Female, 56

**CCRB
Conclusion:** Miscellaneous - Subject
Terminated

**Allegation:** Abuse of Authority:
Premises entered and/or
searched

**CCRB
Conclusion:** Miscellaneous - Subject
Terminated

**Allegation:** Force: Nightstick as club
(incl asp & baton)

**Complainant:** Black Female, 56

**CCRB
Conclusion:** Miscellaneous - Subject
Terminated

additional details

## Complaint #200804851, March 2008

**Complainant:** Black Female, 56

**CCRB Conclusion:** Miscellaneous - Subject Terminated

additional details

## Complaint #200804851, March 2008

**Allegation:** Discourtesy: Word

**Complainant:** Black Female, 23

**CCRB Conclusion:** Unsubstantiated

**Allegation:** Force: Physical force

**Complainant:** Black Female, 23

**CCRB Conclusion:** Exonerated

additional details

## Conclusion Meanings:

**'Exonerated':** or 'Within NYPD Guidelines' - the alleged conduct occurred but did not violate the NYPD's own rules, which often give officers significant discretion.

**'Substantiated':** The alleged conduct occurred and it violated the rules. The NYPD has discretion over what, if any, discipline is imposed.

**'Unsubstantiated':** or 'Unable to Determine' - CCRB has fully investigated but could not affirmatively conclude both that the conduct

**JOSHUA RODRIGUEZ**
**PLAINTIFF *PRO SE***
**811 FLUSHING AVENUE APT. 16D**
**BROOKLYN, N.Y. 11206**
**TEL: 646-975-8838**

**DOCKET: 23-CV-08313-RER-LB**

DATED: 07/14/2025

To:

Inna Shapovalova
*Senior Counsel*
New York City Law Department
100 Church Street
New York, NY 10007
(212)-356-2656
inshapov@law.nyc.gov


Alfred Miller Jr.
Senior Counsel, General Litigation Division
NYC Law Department
100 Church Street
New York, N.Y. 10007
(212)-356-2392
alfmille@law.nyc.gov